CAUSE NO. 2018CI11815

| | | |
|---|---|---|
| PLANT MATERIALS, LLC | ) | DISTRICT COURT |
| | ) | |
| Plaintiff, | ) | |
| | ) | 150TH JUDICIAL DISTRICT |
| v. | ) | |
| | ) | BEXAR COUNTY, TEXAS |
| SOUTHTON RAIL YARD, LLC, SHALE | ) | |
| SUPPORT SERVICES, LLC, SHALE | ) | |
| SUPPORT HOLDINGS, LLC, S. KEVIN BOWEN | ) | |
| and JEFF K. BARTLAM | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

Plaintiff, Plant Materials, LLC ("Plant Materials") files this "Plaintiffs' First Amended Original Petition," against Defendants Southton Rail Yard, LLC, Shale Support Services, LLC, S. Kevin Bowen and Jeff B. Bartlam and alleges as follows:

### I.    DISCOVERY-CONTROL PLAN

1.    Plaintiff intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure, Rule 190.3.

### II.    CLAIM FOR RELIEF

2.    Plaintiff seeks monetary relief over one million dollars ($1 million). Texas Rules of Civil Procedure, Rule 47(c)(4).

### III.    PARTIES

3.    Plaintiff Plant Materials, LLC is a Texas limited liability company located and doing business at 300 East Sonterra Blvd., Suite 310, San Antonio, Texas 78258.

Plaintiff's First Amended Original Petition



Page **1** of **13**

4.     Defendant Southton Rail Yard, LLC (hereinafter referred to as "Southton Rail Yard") is a limited liability company organized in the state of Louisiana, and registered as a foreign limited liability company in the state of Texas, having Cogency Global Inc. as its registered agent in the state of Texas, with a registered address of 1601 Elm St., Suite 4360, Dallas, Texas 75201. Defendant Southton Rail Yard, LLC may be served at this address.

5.     Defendant Shale Support Services, LLC (hereinafter referred to as "Shale Support Services") is a limited liability company organized in the state of Louisiana, having Frank S. Flavich III as its registered agent with an address of 1201 Camellia Blvd., Suite 300, Lafayette, Louisiana 70508. Defendant Shale Support Services may be served at this address.

6.     Defendant Shale Support Holdings, LLC (hereinafter referred to as "Shale Support Holdings") is a Delaware limited liability company having a registered agent of The Company Corporation with an address of 251 Little Falls Drive, Wilmington, Delaware 19809. Defendant Shale Support Holdings may be served at this address.

7.     Defendant S. Kevin Bowen is an individual residing at 6 Lace Pt., Spring, Texas 77382-1703 and may be served at that address.

8.     Defendant Jeff B. Bartlam is an individual that has a work address at 105 Street A, Picayune, Mississippi 79466 and a residence address at 1554 Trails End Lane, Rustin, Virginia 20194. Defendant Bartlam may be served at either of those addresses.

## IV.     VENUE

9.     On May 9, 2014, Plaintiff Plant Materials entered into a "Time and Materials Contract" with "Shale Support Services" (see **Exhibit A**). The Time and Materials Contract provided for determination of disputes in Bexar County, Texas.

10.     On May 20, 2014, Plaintiff Plant Materials entered into a "Construction Contract" with Southton Rail Yard that agreed to exclusive venue in Bexar County, Texas (see **Exhibit B**).

## V.     FACTS

11.     Robert Ober & Associates and its related companies, including Plant Materials, were started in 2006 for the handling and storage of bulk materials used in the concrete, mining and energy sectors of the economy.   Full service solutions were provided, including engineering, procurement and construction of bulk handling and storage facilities.

12.     A typical bulk handling and storage facility costs millions of dollars.

13.     One of Plaintiff's related companies, Plant Architects, LLC would provide the team of experts to design and/or supervise the construction of the facilities.   If Plaintiffs were to do any construction, modifications, repairs or machinery commissioning, these activities were carried out by Plant Outfitters or Plant Materials.

14.     In providing services for its various customers, Robert Ober & Associates has technical personnel, including architects and engineers in its employment.

15.     After entering into the Time and Materials Contract with Shale Support Services on May 9, 2014, Plant Materials began performance under the Time and Materials Contract.   Meetings concerning the Time and Materials Contract occurred in offices of Plant Materials, located at 300 E. Sonterra Blvd., Suite 310, San Antonio, Texas 78258.   Performance of work under the Time and Materials Contract occurred both in San Antonio, Texas and at the plant site outside of Picayune, Mississippi.

16.     Plant Materials worked very hard under the Time and Materials Contract (**Exhibit A**) to try to get the equipment operational as desired by Shale Support Services.   However, the

payments under the Time and Materials Contract by Shale Support Services fell behind. Plant Materials stopped working under the Time and Materials Contract due to non-payment.

17.     The officers and/or employees at Shale Support Services, including Jeff B. Bartlam and S. Kevin Bowen, indicated they also had work for Plant Materials at Southton Rail Yard.

18.     On May 20, 2014, a Construction Contract was entered into between Plant Materials and Defendant Southton Rail Yard, which Construction Contract was entitled "Southton Rail Yard Silo Construction Contract" (see **Exhibit B**).

19.     To get Plant Materials to continue working under the Time and Materials Contract with Shale Support Services, a partial payment was made with additional lump sum payment being due on September 15, 2014.

20.     As additional incentive to get Plant Materials to continue working under the Time and Materials Contract for Shale Support Services, individuals at Shale Support Services proposed additional work at Southton Rail Yard. Those individuals included Bartlam and Bowen, who were officer and/or employees of both Southton Rail Yard and Shale Support Services.

21.     Under the Construction Contract, Southton Rail Yard agreed to pay two million, six hundred and thirty thousand, sixty-two dollars and eighty centers ($2,630,062.80). On May 27, 2014, Plant Materials sent to Southton Rail Yard an invoice in the amount of seven hundred, eighty-nine thousand and eighteen dollars and eighty-four centers ($789,018.84) for 30% of the projected total. See **Exhibit C**. Pursuant to the Construction Contract, Plant Materials prepared plans and specifications, which were approved by Southton Rail Yard which included the same people of Shale Support Services.

22.     Southton Rail Yard did not pay any of its obligations under the Construction Contract.

23.     Pursuant to the request of Southton Rail Yard, Plant Materials prepared architectural renderings and drawings for the construction of the Southton Rail Yard located in San Antonio, Texas. Plant Materials was not paid for the architectural renderings and drawings. The renderings and drawings of the Southton Rail Yard even received an award from the San Antonio Business Journal for the "2014 Best in Commercial Real Estate – Best Industrial Development." (See **Exhibit D**).

24.     To induce Plant Materials to complete the Time and Materials Contract in Picayune, Mississippi, even though Shale Support Services was behind on payment, individuals at Shale Support Services indicated they had the additional Construction Contract work on Southton Rail Yard. Individuals making the representations included, but were not limited to, Jeff B. Bartlam and S. Kevin Bowen, officers of both Shale Support Services and Southton Rail Yard. Jeff Bartlam executed (1) the Time and Materials Contract on behalf of Shale Support Services as its President (see **Exhibit A**) and (2) the Construction Contract on behalf of Southton Rail Yard as its President (see **Exhibit B**). Bartlam and Bowen were officers in both Shale Support Services and Southton Rail Yard and both ultimately reported to the owner of both, namely, Michel B. Moreno.

25.     The promises of work on the Construction Contract at the Southton Rail Yard were to induce Plant Materials to do the work under the Time and Materials Contract in Picayune, Mississippi despite the fact that Plant Materials had not been paid as required under that contract.

26.     Individuals, including Bartlam and Bowen, employed by both Shale Support Services and Southton Rail Yard represented to Plant Materials that if Plant Materials completed the Time and Materials Contract in Picayune, Mississippi, Plant Materials (a) would be paid under the Time

and Materials Contract and (b) would have additional contract work at Southton Rail Yard. Neither of these occurred.

27.     The representations made by Jeff Bartlam, Kevin Bowen and others was that if Plant Materials would complete the work in Picayune, Mississippi, Plant Materials would (a) get paid on that work and (b) get additional work on Southton Rail Yard, were material. These representations were false. The false representations were made with the intent that Plant Materials act on them. Plant Materials relied upon the representations. The representations caused injury to Plant Materials. Defendants either knew the representations were false or made the representations recklessly as a positive assertion without knowledge of that truth.

28.     When Plant Materials attempted to collect from Shale Support Services, Shale Support Services asserted it had no assets. However, the website for Shale Support Services of www.shalesupport.com has indicates Shale Support Services has been in existence since January 2013 and continually operating until today (see **Exhibit E**).

29.     The owner of Shale Support Services (Michel B. Moreno) has a labyrinth of companies and transfers assets freely from one company to another when deemed to his advantage. All of the assets of Shale Support Services were apparently transferred to Shale Support Holdings, LLC in attempt to avoid payment of debts, including debts owed to Plant Materials. Such transfers were for the clear intent of defrauding creditors, specifically including Plant Materials.

30.     Based upon information and belief, the assets of Shale Support Services have been transferred to Shale Support Holdings, one of the other entities in Moreno's labyrinth of companies, to avoid the payment of the amounts owed Plant Materials. The mining operations in Picayune, Mississippi have operated continuously since 2013 under the name of Shale Support.

Nothing was ever indicated to the public that the operation of the mine in Picayune, Mississippi was now being performed by a different company.

31.     While Plant Materials was performing Time and Materials work in Picayune, Mississippi, Defendants represented to Plant Materials that if Plant Materials were to take legal action on their mine site processing plant, it would interfere with the Defendants' offer to purchase the plant from the "bank", and that would make it more difficult for them to pay the invoices that were past due and accumulating.

32.     In exchange for not taking legal action, Plant Materials was promised additional work on the original project that had introduced the Parties to one another, i.e., the Southton Rail Yard in the San Antonio, Texas area.  The additional work was undertaken by Plant Materials for the design and engineering of a terminal infrastructure to be built by Plant Materials thereafter.  The design work was awarded and the Contract executed, but no initial payment was ever received by Plant Materials to build the foundations/infrastructure to the design Plant Materials had developed and the engineering it had completed for the Southton Rail Yard terminal

## VI.     CONDITIONS PRECEDENT

33.     All conditions precedent to Plant Materials bringing this suit and Plant Materials' request for relief have been performed or have occurred.

## VII.     CAUSES OF ACTION

### COUNT 1 - BREACH OF CONTRACT

34.     Plant Materials repeats and realleges the allegations contained in the proceeding paragraphs as if incorporated herein.

35.     Valid and enforceable contracts exist between Plant Materials and (a) Shale Support Services and (b) Southton Rail Yard.

36.     Both Shale Support Services and Southton Rail Yard violated their contracts by failing to satisfy their payment obligations.

37.     As a result of the breach of contracts by Shale Support Services and Southton Rail Yard, Plant Materials has been damaged.

38.     As a result of the breach by Shale Support Services and Southton Rail Yard, Plant Materials is entitled to recover damages under the contract, its attorneys' fees, exemplary damages, pre-judgment interests and post-judgment interests at the maximum rate allowed by law and court costs.

<strong>COUNT 2 – QUANTUM MERIT</strong>

39.     Plant Materials repeats and realleges the allegations contained in the preceding paragraphs as recited herein.

40.     Plant Materials provided valuable services and/or materials to Shale Support Services and Southton Rail Yard.

41.     Shale Support Services and Southton Rail Yard accepted these services and materials.

42.     Shale Support Services and Southton Rail Yard recognized that Plant Materials expected compensation for its services and materials.

43.     As a result, of the breach by Defendant, Plant Materials is entitled to its damages and all other relief as provided by law.

<strong>COUNT 3 – COMMON LAW FRAUD/FRAUDULENT INDUCEMENT</strong>

44.     Plant Materials repeats and realleges the allegations contained in the preceding paragraphs as recited herein.

45.     Defendants represented to Plant Materials that if Plant Materials would complete the word under the Time and Materials Contract in Picayune, Mississippi that Plant Materials (a) would get paid for that work and (b) would have additional work on the Southton Rail Yard.

46.     The representations were material to get Plant Materials to finish the work under the Time and Materials Contract in Picayune, Mississippi.

47.     The representations were false.

48.     When the Defendants made the representations, the Defendants (1) knew the representations were false or (2) made the representations recklessly, as a positive assertion and without knowledge of their truth.

49.     The Defendants made each representation with the intent that Plant Materials act on it. Plant Materials relied on each representation.

50.     The representations caused injury to Plant Materials.

51.     As a result, Plant Materials is entitled to recover damages and such other and further relief as provided by law.

### COUNT 4 – FRAUDULENT TRANSFER

52.     Plant Materials repeats and realleges the allegations contained in the preceding paragraphs as recited herein above.

53.     Plant Materials was owed a debt by Shale Support Services as a result of performance under the Time and Materials Contract.

54.     Assets of Shale Support Services were transferred by the Defendants to Shale Support Holdings to avoid payment of the debt to Plant Materials.

55.     The transfer of assets was made with the intent to defraud Plant Materials.

56.     The transfer of the assets of Shale Support Services by the Defendants was made

    a.     with actual intent to hinder, delay or defraud Plant Materials, or

    b.     without a reasonably equivalent exchange in value for the transfer or obligation.

57.    Shale Support Services

    a.     was engaged or about to engage in a business for which the remaining assets of Shale Support Services were unreasonably small in relationship to the business, or

    b.     intended to incur, or believed or reasonably should have believed, that Shale Support Services would incur debts beyond Shale Support Services' ability to pay as they came due.

58.    Shale Support Services retained possession or control of the assets after they were transferred to Shale Support Holdings.

59.    The transfer of assets from Shale Support Services to Shale Support Holdings was concealed.

60.    Before the transfer of assets, Shale Support Services was requested to pay its debt to Plant Materials.

61.    The transfer of assets was substantially all of Shale Support Services assets.

62.    Shale Support Services became insolvent as a result of a transfer to Shale Support Holdings.

63.    The transfer of assets from Shale Support Services to Shale Support Holdings occurred shortly after the debt to Plant Materials was incurred.

64.    The transfer of assets by Shale Support Services to Shale Support Holdings was a transfer to an insider.

65.    As a result of the transfer, Shale Support Services became insolvent.

66.    As a result of the fraudulent transfer, Plant Materials is entitled to recover its damages from any and all Defendants that participated in the fraudulent transfer

## VIII.   CIVIL CONSPIRACY

67.    Plant Materials repeats and realleges the allegations contained in the preceding paragraphs as recited herein above.

68.    Defendants were members of a combination of two or more entities or persons.

69.    The object of the combination was to accomplish (1) an unlawful purpose or (2) a lawful purpose by unlawful means.

70.    The Defendants or the combination had a meeting of the minds on the object or course of action.

71.    One of the Defendants committed an unlawful overt act to further the object or course of action.

72.    Plant Materials suffered injury as an approximate result of the wrongful act.

## IX.   JURY DEMAND

73.    Plaintiff Plant Materials hereby requests a jury trial.

## X.    REQUEST FOR DISLCOSURE

74.    Under the Texas Rules of Civil Procedure, Rule 194, Plant Materials requests that the newly added Defendants disclose within fifty (50) days of the service of this request, the information or material described in Texas Rules of Civil Procedure, Rule 194.2.

## XI.    PRAYER

75.    Southton Rail Yard has already answered and appeared herein.

For the reasons indicated herein above, Plaintiff asks the Court to issue citation for Defendants Shale Support Services, LLC, Shale Support Holdings, LLC and Shale Energy, LLC

d/b/a Shale Support, LLC to appear and answer and that Plaintiff be awarded judgment against all Defendants as follows:

1.   Actual damages incurred by Plaintiff Plant Materials as a result of Defendants' acts;

2.   Benefits received by the Defendants' by Plaintiff's performance of work and supplying of materials;

3.   Exemplary damages be awarded against Defendants because of willful and intentional acts;

4.   Prejudgment and post-judgment interests be entered in favor of Plaintiff Plant Materials against Defendants;

5.   Court costs be awarded to Plaintiff Plant Materials;

6.   Attorneys' fees be awarded to Plaintiff Plant Materials; and

7.   All other and further relief to which Plaintiff Plant Materials is justly entitled.

Respectfully submitted,

GUNN, LEE & CAVE, P.C.
300 Convent St., Suite 1080
San Antonio, TX 78205
Phone: 210-886-9500
Fax: 210-886-9883

/s/ Ted D. Lee
Ted D. Lee, TSB #12137700
tedlee@gunn-lee.com
Nick Guinn, TSB #24087642
nickguinn@gunn-lee.com

ATTORNEYS FOR PLAINTIFF
PLANT MATERIALS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was sent via ECF notification and/or email to the following on the 2nd day of August, 2018.

Kyle A. Ferachi                                    VIA EMAIL:  kferachi@mcglinchey.com
Sephanie Laird Tolson                              VIA EMAIL:  stolson@mcglinchey.com
McGlinchey Stafford, PLLC
1001 McKinney, Suite 1500
Houston, Texas  77002

ATTORNEYS FOR DEFENDANT
SOUTHTON RAIL YARD, LLC

/s/ Ted D. Lee_____
Ted D. Lee

CAUSE NO. 2018CI11815

# PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

# EXHIBIT A



# Plant Materials

300 East Sonterra Blvd., Suite 310
San Antonio, Texas 78258 USA
phone: (210) 569-9262 • fax: (210) 497-7752
www.robertober.com

May 9, 2014

Proposal #1

TO:   Shale Support Services
      Jeff Bartlam, President
      105 Street A
      Picayune, MS 39466
      Ph: 601. 749.3458
      Dir: 202. 262.7095

FROM:   Tony DeJoseph, COO
        Plant Materials, LLC
        Office: 210.569.9262
        Fx: 210.497.7752
        tdj@robertober.com

ATTN:  Paul Deville,

Dear Paul, Plant Outfitters is pleased to present you this contract for the following work for the Shale Support Upgrade. EQUIPMENT/SERVICES: The below costs are per week based on 7 days a week and two 12 hour shifts.

| | |
|---|---|
| Ironworker Labor: Ironworkers Day Shift-$905.00/man/8 hr day - (5 men - weekly total = 7 days) | $38,010.00 |
| Ironworker-OT Hrs Labor: Ironworkers Day Shift-$137.50/hr over 8 hr day - (5 men @ 4 hrs ea. day - weekly total = 7 days) | $23,100.00 |
| Ironworker Labor: Ironworkers Night Shift $1200.00/man/8 hr day - (5 men - weekly total = 7 days) | $50,400.00 |
| Ironworker-OT Hrs Labor: Ironworkers Night Shift- $225.00/hr over 8 hr day - (5 men @ 4 hrs ea. day - weekly total = 7 days) | $37,800.00 |
| Equipment Rental-Generator $2500.00/month - (weekly total = 7 days | $625.00 |
| Equipment Rental -Three (3) Welding Machine $1500.00/each= $4500.00/month (weekly total = 7 days) | $1,125.00 |
| Parts All Materials will be invoiced at Cost plus OH + 10% (including welding supplies) | TBD |
| Welding Supplies (weekly total = 7days) Two weeks max | $1900.00 |
| Equipment Rental 10# Fork Lift (weekly total = 7 days) | $1,175.00 |
| Supervisor Labor: Supervisor $1200.00/day (weekly total = 7 days) | $8,400.00 |

Proposal # 1                                    − 2 −                                    April 17, 2014

Equipment Rental Crane - 70 Ton @ $170.00 per hour with 8 hour
Minimum                                                                                    TBD

Equipment Rental Crane - 40 Ton @ $120.00 per hour with 4 hour
Minimum                                                                                    TBD

Terms: TBD with signed final proposal 0.00 0.00

Parts Welding Gases-Oxygen and acetylene will be provided
by Shale Support Services

**EXCLUSIONS**: This quotation does not include:
Parts Welding Gases-Oxygen and acetylene will be provided
by Shale Support Services

**PER WEEK COST:**                                      **(Valid 30 Days):  $162,535.00**

**Plus Estimate for steel quote as of 4/17/14**                             **$23,695.03**

Proposal # 1                              – 3 –                              April 17, 2014

**GENERAL DESCRIPTION OF SCOPE: Required from SSS**

**PROPOSED PRELIMINARY PROJECT SCHEDULES: TBD**

**TERMS:**

XX% down payment with signed order; weekly total progress payments

**WIRE TRANSFERS:**
Beneficiary:   Plant Materials, LLC
Bank:          Frost Bank
               100 West Houston St.
               San Antonio, TX 78205 USA
Account #: 020297232
ABA #: 114000093
SWIFT: FRSTUS44

**MAILED PAYMENTS:**
Robert Ober & Associates and its affiliates Plant Materials, LLC
18866-103 Stone Oak Parkway, Drwr 4
San Antonio, TX 78258

**OVERNIGHT (FED-EX, UPS, ETC.) PAYMENTS:**
Plant Materials, LLC
300 East Sonterra Blvd., Suite 310
San Antonio, Texas  78258 USA

Robert Ober & Associates, LLC offers only those items specifically identified as included in this quotation.  No assumption may be made concerning the inclusion of any item not specifically described.

**DELIVERY, INSURANCE & CLAIMS:**
Delivery of services shall be made as described.  Delivery of equipment shall be made by placing the equipment F.O.B. the carrier at the point of manufacture.  Title and risk of loss shall pass to the Owner at the time and place of such delivery, except to the extent that title may be retained by Contractor as security for payment.  Contractor shall not be liable for any damage whatsoever in transit.  Purchase of transit insurance is the responsibility of the Owner, and it shall be the Owner's responsibility to immediately make claims for any damaged or lost goods against the delivering carrier at the Owner's expense.  In the event of any shortages or deficiencies in the equipment received, Owner agrees to advise Contractor of same within 10 days.  Owner further agrees not to withhold any money due Contractor for the original shipment or replacement shipments pending settlement of any such claims.

**CANCELLATION:**
Owner may not cancel this agreement with respect to services already provided, or as to any equipment after shipment of the equipment. Prior to the shipment of the equipment, Owner may cancel only upon Contractor accepting such cancellation and upon Contractor agreeing to the following special provisions:
1) In the case of standard equipment, Owner shall pay Contractor 25% of Owner's purchase price as cancellation charges.
2) In the case of any product or system modified or made to order for the Owner, the Owner shall pay all engineering and manufacturing costs up to the date of acceptance of the cancellation by Contractor.

Proposal # 1                                    — 4 —                                    April 17, 2014

3)  Payment of cancellation charges shall be made by the Owner upon receipt of a statement from Contractor.

## NOTES:

All proposals are valid for a period of 30 days from date shown on quote. Purchase orders received 30 days after the date of this proposal will not be accepted and Robert Ober & Associates will issue a new proposal.

The attached statement of Warranty is incorporated into this quotation as a part of the quotation as though here set out in full.

The laws of the State of Texas will govern any agreements covering the purchase of the items offered in this quotation. All obligations and undertakings of the parties are to be performed at San Antonio, Bexar County, Texas.

ORDER CONFIRMATION

_____
Customer's Signature

Print Name / Title

DATE Signed: ___5/9/14___

_____
Robert Ober & Associates Representative

ROBERT OBER, CEO

Print Name / Title

DATE Signed: ___09 MAY 2014___

By signing this proposal, customer authorizes Robert Ober & Associates, LLC to enter this order.  Attached terms and conditions of the Robert Ober & Associates sales contract will apply.

THIS DOCUMENT, ALL ITS TECHNICAL INFORMATION AND DETAILS CONTAINED HEREIN ARE PROPERTY OF ROBERT OBER & ASSOCIATES, LLC, SAN ANTONIO, TEXAS 78258, U.S.A.  IT IS NOT TO BE DISCLOSED IN ANY MANNER TO ANY COMPETITORS OF ROBERT OBER & ASSOCIATES, OR TO ANY OTHER PARTY.

**ROBERT OBER & ASSOCIATES** AND ITS AFFILIATES
TERMS AND CONDITIONS FOR THE PROVISION OF SERVICES, EQUIPMENT, PARTS, OR RENTAL

1. DEFINITIONS
As used throughout these Terms and Conditions, the definitions of "Contractor" and "Owner" shall be those parties respectively designated as such on the face of the attached Contractor's Proposal. "Party" shall be used to refer to either Contractor or Owner. "Parties" shall refer to both Contractor and Owner. The term "Services" shall include specification, design, procurement, delivery, installation, labor, inspection and/or testing specified, performed or required to be performed in connection with any services or goods ordered pursuant to the Proposal. The term "Goods" includes machinery, equipment, parts, materials, items and property of every type, kind and description provided by Contractor, as described on the face of the attached Proposal. The term "Manufacturer" refers to a manufacturer of Goods not Contractor. "Project" shall mean the work specified in the attached Contractor's Proposal.

2. ACCEPTANCE
This contract consists of this Agreement, any attached Contractor's Proposal, and any attached Exhibits, and/or Supplementary and other Conditions, any other documents listed in this Agreement, together with changes and modifications to the foregoing agreed in writing by Contractor and Owner. Commencing performance or providing Services or making deliveries of Goods or any acknowledgement of this Agreement by either party shall constitute an acceptance of the terms of this Agreement by said party.  The parties are bound only by (a) the terms and conditions (without conditions or modifications) stated in these Terms and Conditions for provision of Services, Equipment, Parts, or Rental (the "Terms and Conditions"); (b) the attached written proposal submitted by Contractor to Owner ("Proposal"), if any; (c) the written order acknowledgment issued by Contractor to Owner ("Acknowledgment"), if any; and, (d) any change orders identified as such and agreed to in writing by Contractor (the Order, Terms and Conditions, Proposal, Acknowledgment, and any such change order, and any such additional terms as agreed to in writing by an authorized representative of Contractor collectively referred to herein as the "Agreement"). Owner's submission of a purchase order (or other similar document) shall be deemed to be an express acceptance of these Terms and Conditions notwithstanding language in Owner's purchase order (or other similar

document) inconsistent herewith, and any inconsistent language in Owner's purchase order (or other similar document) is hereby rejected.  Owner's purchase order (or other similar document) is incorporated in this Agreement, only to the extent of specifying the nature and description of the Services, Equipment, Parts or Rental and then only to the extent consistent with the Proposal or Acknowledgment. In the event of any conflict between a Proposal and an Acknowledgement, the Acknowledgment shall prevail.

3. PRICES
Prices of Services, Equipment, Parts, or Rental shall be as stated in the attached Contractor's Proposal or subsequent Acknowledgment, or if there is no Proposal or Acknowledgment, as otherwise agreed to in writing by Contractor.  Additional or standby labor charges are US $860 per day; additional or standby equipment charges are cost plus overhead of 13.7% and a reasonable profit of not less than 20%.  Unless otherwise specified, all prices contained in the attached Contractor's Proposal are valid for 30 days from date of issue of the Proposal.  All price quotations for Equipment, Parts or Rentals are EXW Contractor's or Manufacturer's premises (INCOTERMS 2010), or as agreed per the Proposal or Acknowledgement and are subject to change without notice.  All sales, use, rental, import, excise and like taxes, whether foreign or domestic, shall be charged to and borne by Owner. Contractor bears no responsibility for any consular fees, fees for legalizing invoices, certificates of origin, stamping bills of lading, or other charges required by the laws of any country of destination, or any fines imposed due to incorrect declarations.  Charges will be added for factory preparation and packaging for shipment.  Minimum freight and invoice charges in effect at the time of the Order shall apply.  If by reason of any act of government, the cost to Contractor of performing its obligations hereunder is increased, such increase shall be added to the quoted price.

4. PAYMENT TERMS
Payment Terms are as specified by Contractor in the attached Contractor's Proposal, or as specified in a subsequent Acknowledgement, and if not there specified, remaining charges, including applicable

**Proposal # 1**      − 5 −      April 17, 2014

packing and transportation costs, billed by Contractor are payable within net 30 days of the date of invoice. Contractor reserves the right to modify or withdraw credit terms at any time without notice. Unless otherwise specified, all payments are due in the currency specified in Contractor's Proposal, Acknowledgment and/or invoice. Interest shall be due from Owner to Contractor on overdue accounts at the maximum rate allowed by law. When partial shipments are made, the goods will be invoiced as shipped and each invoice will be treated as a separate account and be payable accordingly. Payment for goods is due whether or not technical documentation and/or any final party certifications are complete at the time of shipment. Contractor shall be entitled to recover all reasonable attorneys' fees and other costs incurred in the collection of overdue accounts. Contractor reserves the right, where a genuine doubt exists as to Owner's financial position or if Owner is in default of any payment obligation, to suspend delivery or performance of any Agreement or any part thereof without liability and without prejudice to, and without limitation of, any other remedy available to Contractor until Owner cures the default or satisfactory security for payment has been provided. Contractor shall have the option to extend the delivery date by a time at least equal to the period of such suspension. In the event of Rental, should Owner default in meeting any of the terms hereunder for any reason, Contractor has the right to retrieve all Rentals as detailed in the Proposal and also to collect rental payments due. If Owner elects to exercise a purchase option for Rental equipment, rental charges will be incurred and will be invoiced until the later of: (i) the end of the agreed rental period; or (ii) 30 days prior to the receipt of total purchase price and all other rental amounts due.

## 7. SUPERVISION

Contractor shall provide a competent Project Supervisor, authorized to act for Contractor and to work with Owner. Contractor's executive officers shall give the work such personal supervision as may be necessary for the proper execution of the work. Contractor shall supervise its staff on site, and keep Contractor's work area free from accumulation of waste materials or rubbish caused by Contractor's operations under this Agreement. At the completion of the Project, Contractor shall remove from the Project waste materials, rubbish, Contractor's tools, construction equipment, machinery and surplus materials.

## 9. SPECIFICATIONS, DRAWINGS, ENGINEERING DATA, EVALUATIONS

Contractor shall prepare specifications, drawings and other information required to perform the work which shall be submitted to the Owner for his consideration and acceptance. All plans, drawings, prints and specifications and all copies thereof, supplied to Contractor by Owner or prepared by Contractor for this Project shall be the property of Owner. Contractor shall return them to Owner upon completion of the work or otherwise dispose of them at the written direction of the Owner.

## 5. PROCUREMENT OF MATERIALS

All purchasing shall be accomplished by purchase order on Contractor's forms. In connection with procurement services rendered by Contractor, all discounts, rebates and refunds shall accrue to Contractor.

## 6. DELIVERY

Delivery Terms are as specified by Contractor in the attached Contractor's Proposal, or as specified in a subsequent Acknowledgement, and if not there specified, delivery shall be EXW Contractor's or Manufacturer's premises (INCOTERMS 2010), as determined by Contractor, except to the extent modified by these Terms and Conditions. Partial shipments may be made as agreed to by Owner and Contractor. Stated delivery dates are approximate only and cannot be guaranteed. Contractor shall have no liability for damages arising out of the failure to keep a projected delivery date, irrespective of the length of the delay. In the event Owner is unable to accept delivery of goods when tendered, Contractor may, at its option, arrange for storage of the goods at Owner's sole risk and Owner shall be liable to Contractor for the reasonable cost of such storage. The provision is without prejudice to any other rights which Contractor may have with respect to Owner's failure to take delivery of goods, which includes the right to invoice Owner for the goods. Owner is responsible for all shipping costs from Contractor's premises to the location as designated by the Owner. All shipping costs for the return of goods from the location specified by Owner to Contractor's or Manufacturer's premises shall also be for Owner's account.

8. RECORDS, ACCOUNTING, INSPECTION Contractor shall keep full and detailed records and accounts. Contractor shall afford Owner's authorized personnel and independent auditors, if any, full access to the work and to all of Contractor's books, records, correspondence, instructions, drawings, receipts, vouchers and other documents relating to work under this contract, and Contractor shall preserve all such records for two (2) years after final payment. Contractor shall deliver to Owner upon completion of the work, a statement of the cost of the work detailed according to the accounting procedure and requirements of Owner.

## 10. CHANGE ORDER

Without invalidating the Agreement, the Owner may, at any time or from time to time, order additions, deletions or revisions in the work; these will be authorized by written change orders signed by owner's representative. Without invalidating the Agreement, Contractor may, at any time or from time to time, order alternate materials or supplies if specified materials or supplies are not available, or substitution is appropriate due to advancement in technology, material flow, or other proprietary or corporate alignments; these will be authorized by written change orders. Upon receipt of a written change order, the contractor will proceed with the work involved. All work shall be executed under the applicable conditions of the contract documents. If any change order causes an increase or decrease in the contract price or an extension or shortening of the contract time, an equitable adjustment will be made and if Owner maintains that Contractor's adjustment is not equitable, the price change shall be negotiated. In the event the parties cannot agree, the Owner shall immediately pay 75% of the Contractor's proposed adjustment, and allow Contractor such additional time as Contractor estimates necessary, and the final determination shall be made in accordance with the dispute resolution provision of this Agreement. Contractor is under no obligation to perform work in relation to oral change orders.

## 11. COMPLETION OF WORK

It is understood that time is of the essence and that, subject to the directions of the Owner, Contractor shall complete all authorized work in a minimum of time consistent with good construction and professional practices. If Contractor is delayed in the performance of the work by reason of a failure of equipment manufacturers to deliver equipment to Contractor by the dates scheduled in the Project schedule, without fault of Contractor, then time allowed shall be extended for a period equal to the time of the delay, if, within ten (10) days after such delay, Contractor provides written notice thereof to the Owner.

## 12. FORCE MAJEURE

If either party is unable by reason of Force Majeure to carry out any of its obligations under this Agreement, other than the obligations to pay money when due and indemnification obligations assumed hereunder, then on such party giving notice and particulars in writing to the other party within a reasonable time after the occurrence of the cause relied upon, such obligations shall be suspended. "Force Majeure" shall include acts of God, laws and regulations, government action, war, civil disturbances, strikes and labor problems, delays of vendors, carriers, tightening, fire, flood, washout, storm, breakage or accident to equipment or machinery, shortage of raw materials, and any other causes that are not reasonably within the control of the party so affected. Contractor shall be paid its applicable standby rate, if any, during any such Force Majeure event.

## 13. CANCELLATION

Orders placed by Owner and accepted by Contractor may be canceled only with consent of Contractor

and will subject Owner to cancellation charges which shall include Contractor's actual costs, overhead at 13.7% and a reasonable profit not less than 20%. For Rentals, minimum rental charges as stated in the Proposal will apply. Owner shall verify the amount of the cancellation charges prior to canceling an order.

## 14. TITLE AND RISK OF LOSS

For purchased goods, ownership and risk of loss pass to Owner upon the earlier of (a) Contractor's delivery of the goods, or (b) invoicing by Contractor for the goods where Owner is unable to accept delivery on the scheduled date. Contractor retains a security interest in the goods until the purchase price has been paid, and Owner agrees to perform upon request all acts required to secure Contractor's interest. Contractor accepts no responsibility for any damage, shortage or loss in transit. Contractor will attempt to pack or prepare all shipments so that they will not break, rust or deteriorate in shipment, but Contractor does not guarantee against such damage. Claims for any damage, shortage or loss in transit must be made by Owner on the carrier.

In the event of Rental, Owner assumes all risk and liability whether or not covered by insurance, for loss or damage to the Rental machinery or equipment. Risk and liability passes to Owner upon delivery by Contractor. Title to Rental machinery or equipment shall remain with Contractor at all times. Owner acquires no ownership, title or property rights to the Rental machinery or equipment except the right to use the Rental machinery or equipment subject to the terms of this Agreement.

## 15. PERFORMANCE GUARANTEES

Performance guarantees and Contractor's obligations therefore shall be in accordance with the provisions and conditions of proposal attached hereto.

## 16. LIMITED WARRANTY

Service. Contractor warrants that the Services to be provided pursuant to this Agreement shall conform to the material aspects of the specifications set forth in the Agreement. Contractor shall re-perform that part of the non-conforming Services, provided Contractor is notified by Owner prior to Contractor's departure from the worksite.

New Equipment/Parts. In the case of the purchase of new Equipment/Parts, and solely for the benefit of the original user, Contractor warrants, for a period of eighteen (18) months from delivery or twelve (12) months from installation, whichever is earlier, that new Equipment/Parts of its own manufacture shall conform to the material and technical specifications set forth in the Agreement. Goods manufactured by others are sold "as is" except to the extent the manufacturer honors any applicable warranty made by the manufacturer. Secondhand goods are sold "as is". If the new Equipment/Parts fail to conform to such specifications upon inspection by Contractor, Contractor will, at its option and as Owner's sole remedy, either repair or replace such defective Equipment/Parts with the type originally furnished.

Rental. Contractor warrants that the Rental equipment to be provided pursuant to this Agreement shall conform to the material aspects of the specifications set forth in the Agreement. Provided Contractor is notified by Owner prior to Contractor's departure from the worksite, Contractor shall repair or replace non-conforming Rental equipment.

Contractor's warranty obligations hereunder shall not apply if non-conformity or failure was caused by (a) Owner's failure to properly store or maintain the equipment or parts; (b) the unauthorized modification, repair or service of the equipment or parts by Owner; (c) utilization of replacement parts not provided by Contractor or Contractor's OEM; or (d) use or handling of the equipment by Owner in a manner inconsistent with Contractor's/Contractor's OEM's recommendations. Further, Contractor's warranty obligations under this Article 16 shall terminate if (a) Owner fails to perform its obligations under this or any other Agreement between the parties, or (b) if Owner fails to pay any charges due Contractor. Any third party warranties provided on equipment or parts not manufactured by Contractor are assigned to Owner, without recourse, at the time of delivery, provided such warranties are assignable.

THIS ARTICLE 16 SETS FORTH OWNER'S SOLE REMEDY AND CONTRACTOR'S EXCLUSIVE OBLIGATION WITH REGARD TO NON-CONFORMING SERVICES, EQUIPMENT, PARTS OR RENTAL. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED PURSUANT TO THE PROVISIONS OF THIS ARTICLE 16, CONTRACTOR MAKES NO OTHER WARRANTIES OR REPRESENTATIONS OF ANY KIND, EXPRESS OR IMPLIED, AND CONTRACTOR DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## 17. SUBCONTRACTING AND ASSIGNMENT

This contract may not be assigned or encumbered. Contractor will bind every subcontractor by written contract to observe all the terms of this Agreement to the extent that they may be applicable to such subcontractors.

## 18. LIABILITIES, RELEASES AND INDEMNIFICATION

For purpose of this Article 18, the following definitions shall apply:

"Contractor Group" shall mean (i) Contractor, its parent, subsidiary or related companies, (ii) its and their working interest Contractors, co-lessees, co-Contractors, partners, joint ventures, if any, and their respective parents, subsidiary or related companies and (iii) the officers, directors, employees, consultants, agents and invitees of all of the foregoing.

"Owner Group" shall mean (i) Owner, its parent, subsidiary or related companies, (ii) its and their working interest Contractors, co-lessees, co-Contractors, partners, joint ventures, if any, and their respective parents, subsidiary or related companies and (iii) the officers, directors, employees, consultants, agents and invitees of all of the foregoing.

"Claims" shall mean all claims, demands, causes of action, liabilities, damages, judgments, fines, penalties, awards, losses, costs, expenses (including, without limitation, attorneys' fees and costs of litigation) of any kind or character arising out of, or related to, the performance of or subject matter of this Agreement (including, without limitation, property loss or damage, personal or bodily injury, sickness, disease or death, loss of services and/or wages, or loss of consortium or society).

a) Contractor shall release, indemnify, defend and hold Owner Group harmless from and against any and all Claims in respect of personal or bodily injury to, sickness, disease or death of any member of Contractor Group or Contractor Group's subcontractors or their employees, agents or invitees, and all Claims in respect of damage to or loss or destruction of property owned, leased, rented or hired by any member of Contractor Group or Contractor Group's subcontractors or their employees, agents or invitees.

b) Owner shall release, indemnify, defend and hold Contractor Group harmless from and against any and all Claims in respect of personal or bodily injury to, sickness, disease or death of any member of Owner Group or Owner Group's other contractors or their employees, agents or invitees, and all Claims in respect of damage to or loss or destruction of property owned, leased, rented or hired by any member of Owner Group or Owner Group's other contractors or their employees, agents or invitees.

c) Notwithstanding anything contained in this Agreement to the contrary, in all instances where Contractor is providing Services at Owner's site, Owner, to the maximum extent permitted under applicable law, shall release, indemnify, defend and hold Contractor Group and Contractor Group subcontractors harmless from and against any and all Claims asserted by or in favor of any person or

Proposal # 1        – 6 –        April 17, 2014

party, including Contractor Group, Owner Group or any other person or party, resulting from: (i) loss of or damage to the site, (ii) to any feature, natural or manmade on the site, (iii) to any material, commodity, or interest, natural or manmade, on the site (iv) pollution or contamination of any kind (other than surface spillage of fuels, lubricants, rig sewage or garbage, to the extent attributable to the negligence of Contractor Group, including but not limited to the cost of control, removal and clean-up, or (v) damage to, or escape of any substances from, any pipeline, vessel or storage facility.

d) NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER AND EACH PARTY RELEASES THE OTHER FOR ANY INDIRECT, SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES OR LOSSES (WHETHER FORESEEABLE AT THE DATE OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, DAMAGES FOR LOST PRODUCTION, LOST REVENUE, LOST PRODUCT, LOST PROFIT, LOST BUSINESS OR BUSINESS OPPORTUNITIES.

e) Contractor's total liability for all claims, damages, causes of action, demands, judgments, fines, penalties, awards, losses, costs and expenses (including attorney's fees and cost of litigation) shall be limited to and shall not exceed the value of the Services, Equipment, Parts or Rental purchased and paid under the Agreement.

f) THE EXCLUSIONS OF LIABILITY, RELEASES AND INDEMNITIES SET FORTH IN PARAGRAPHS A. THROUGH E. OF THIS ARTICLE 18 SHALL APPLY TO ANY CLAIM(S), LOSSES OR DAMAGES WITHOUT REGARD TO THE CAUSE(S) THEREOF, INCLUDING BUT NOT LIMITED TO PRE-EXISTING CONDITIONS, WHETHER SUCH CONDITIONS BE PATENT OR LATENT, THE UNSEAWORTHINESS OF ANY VESSEL OR VESSELS, IMPERFECTION OF MATERIAL, DEFECT OR FAILURE OF PRODUCTS OR EQUIPMENT, BREACH OF REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED), ULTRAHAZARDOUS ACTIVITY, STRICT LIABILITY, TORT, BREACH OF CONTRACT, BREACH OF DUTY (STATUTORY OR OTHERWISE), BREACH OF ANY SAFETY REQUIREMENT OR REGULATION, OR THE NEGLIGENCE OR OTHER LEGAL FAULT OR RESPONSIBILITY OF ANY PERSON (INCLUDING THE INDEMNIFIED OR RELEASED PARTY), WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, ACTIVE OR PASSIVE.

g) Redress under the indemnity provisions set forth in this Article 18 shall be the exclusive remedy (ies) available to the parties hereto for the matters, claims, damages and losses covered by such provisions.

### 19. INSURANCE

Upon written request, each party shall furnish to the other party certificates of insurance evidencing the fact that the adequate insurance to support each party's obligations hereunder has been secured. To the extent of each party's release and indemnity obligations expressly assumed by each party hereunder, each party agrees that all such insurance policies shall, (a) be primary to the other party's insurance; (b) include the other party, its parent, subsidiary and affiliated or related companies, and its and their respective officers, directors, employees, consultants and agents as additional insured; and, (c) be endorsed to waive subrogation against the other party, its parent, subsidiary and affiliated or related companies, and its and their respective officers, directors, employees, consultants and agents.

### 20. OWNERSHIP AND PATENT INDEMNITY

Contractor warrants that the use or sale of Equipment or Parts hereunder will not infringe patents of others by reason of the use or sale of such Equipment or Parts per se, and hereby agrees to hold Owner harmless against judgment for damages for infringement of any such patent, provided that Owner shall promptly notify Contractor in writing upon receipt of any claim for infringement, or upon the filing of any such suit for infringement, whichever first occurs, and shall afford Contractor full opportunity, at Contractor's option and expense, to answer such claim or threat of suit, assume the control of the defense of such suit, and settle or compromise same in any way Contractor sees fit. Contractor does not warrant that such Equipment or Parts: (a) will not infringe any such patent when not of Contractor's manufacture, or supplied to, in whole or in part, to the Owner's design specifications; or (b) if used or sold in combination with other materials or apparatus or used in the practice of processes, will not, as a result of such combination or use, infringe any such patent, and Contractor shall not be liable and does not indemnify Owner for damages or losses of any nature whatsoever resulting from actual or alleged patent infringement arising pursuant to (a) and (b) above. THIS ARTICLE STATES THE ENTIRE RESPONSIBILITY OF CONTRACTOR CONCERNING PATENT INFRINGEMENT.

### 21. REGULATORY COMPLIANCE

By acceptance of delivery under this Agreement, Owner warrants it has complied with all applicable governmental, statutory and regulatory requirements and will furnish Contractor with such documents as may be required. Contractor warrants and certifies that in the performance of this Agreement, it will comply with all applicable statutes, rules, regulations and orders, including laws and regulations pertaining to labor, wages, hours and other conditions of employment, and applicable price ceilings if any. Contractor will not provide any certification or other documentation nor agree to any contract provision or otherwise act in any manner which may cause Contractor to be in violation of applicable United States law, including but not limited to the Export Administration Act of 1979 and regulations issued pursuant thereto. All Orders shall be conditional upon granting of export licenses or import permits which may be required. Owner shall obtain at its own risk any required export license and import permits and Owner shall remain liable to accept and pay for material if licenses are not granted or are revoked.

### 22. CONFIDENTIAL INFORMATION

Each party recognizes and acknowledges that it shall maintain all data, information, disclosures, documents, drawings, specifications, patterns, calculations, technical information and other documents (collectively, "Confidential Information") obtained from the other party in strict confidence. However, nothing hereinabove contained shall deprive the party receiving the Confidential Information of the right to use or disclose any information: (a) which is, at the time of disclosure, known to the trade or public; (b) which becomes at a later date known to the trade or the public through no fault of the party receiving the Confidential Information and then only after said later date; (c) which is possessed by the party receiving the Confidential Information, as evidenced by such party's written records, before receipt thereof from the party disclosing the Confidential Information; (d) which is disclosed to the party receiving the Confidential Information in good faith by a third party who has an independent right to such information; (e) which is developed by the party receiving the Confidential Information as evidenced by documentation, independently of the Confidential Information; or, (f) which is required to be disclosed by the party receiving the Confidential Information pursuant to an order of a court of competent jurisdiction or other governmental agency having the power to order such disclosure, provided that the party receiving the Confidential Information uses its best efforts to provide timely notice to the party disclosing the Confidential Information of such order to permit such party an opportunity to contest such order. In the event that Contractor owns copyrights to, patents to or has filed patent applications on, any technology related to the Services, Equipment, Parts or Rental furnished by Contractor hereunder; and if Contractor makes any improvements on such technology, then Contractor shall own all such improvements, including drawings, specifications, patterns, calculations, technical information and other documents.

### 24. INDEPENDENT CONTRACTOR

It is expressly understood that Contractor is an independent contractor, and that neither Contractor nor its principals, partners, employees or subcontractors are servants, agents or employees of Owner.

### 25. ADDITIONAL RENTAL TERMS AND CONDITIONS

Unless otherwise indicated, the rental rates contained in Contractor's Proposal are on a per day basis and such rates shall apply to each piece of equipment or part rented. Contractor represents that it has fully inspected the Rental equipment and parts as detailed in the Agreement and that said equipment and parts are in good condition and repair, and are fully acceptable for use as specified in the

Agreement. Furthermore, Contractor represents that the Rental equipment and parts are not subject to any encumbrances or liens, and that Contractor has full title to the equipment and parts, and thus, Contractor is authorized to enter into and execute this Agreement.

Owner represents that it shall use the Rental equipment and parts in a careful and proper manner and shall comply with all laws, ordinances and regulations relating to the possession, use and maintenance of the equipment and parts in accordance with Contractor's approved procedures. In the event the parties agree that the Owner shall operate the Rental equipment and parts, Owner further represents that the Rental equipment and parts will be operated by skilled employees trained in the use of the Rental equipment and parts. Owner shall keep the Rental equipment and parts free and clear of all liens and encumbrances arising in connection with Owner's operations and/or use of the Rental equipment and parts. Owner, at its sole cost, shall provide and maintain insurance against the loss, theft, damage or destruction of the Rental equipment and parts. The coverage shall be in an amount not less than the new replacement price of the Rental equipment and parts. Robert Ober & Associates shall provide equipment and parts prices at execution of this Agreement.

At the expiration of the applicable rental term, Owner will at its sole cost return the Rental equipment to the facility designated by Contractor, in working condition (reasonable wear and tear excepted). Upon receipt of the returned Rental equipment, Contractor will service and inspect the Rental equipment. In the event Contractor determines that the Rental equipment is materially damaged or not in working condition (reasonable wear and tear accepted), any service work required to bring the Rental equipment to good working condition will be charged back to the Contractor. Such charges may include service, inspection, and spare parts.

### 26. GENERAL

Failure of Owner or Contractor to enforce any of the terms and conditions of this Agreement shall not prevent a subsequent enforcement of such terms and conditions or be deemed a waiver of any subsequent breach. Should any provisions of this Agreement, or portion thereof, be unenforceable or in conflict with applicable governing country, state, province, or local laws, then the validity of the remaining provisions, and portions thereof, shall not be affected by such unenforceability or conflict, and this Agreement shall be construed as if such provision supersedes all prior oral or written agreements or representations. Owner acknowledges that it had not relied on any representations other than those contained in this Agreement. This Agreement shall not be varied, supplemented, qualified, or interpreted by any prior course of dealing between the parties or by any usage of trade and may only be amended by an agreement executed by an authorized representative of each party.

27. NOTICES All notices hereunder shall be deemed to be made properly if sent by mail, package express or hand delivery to Contractor at 300 East Sonterra Boulevard, Suite 310, San Antonio, Texas 78258 and to Owner at the address stated on the attached Contractor's Proposal. The address may be changed by either party by similar notice. Notice shall be effective upon receipt. Either party giving such notice shall also notify promptly the other party's Engineer, as appropriate.

### 28. MISCELLANEOUS PROVISIONS

(a) This contract constitutes the entire agreement between Contractor and Owner relating to the work. There are no previous or contemporary representations or warranties of Owner or Contractor not set forth herein.

(b) Except as specifically provided herein, no modification, waiver, termination, rescission, discharge, or cancellation of this contract or of any terms thereof shall be binding on either party unless in writing and executed by an officer or employee of the party to be charged specifically authorized to do so.

(c) No waiver of any provision of or a default under this Agreement shall affect the right of either party thereafter to enforce said provision or to exercise any right or remedy in the event of any other default, whether or not similar.

(d) No modification, waiver, termination, discharge or cancellation of this Agreement or of any terms thereof shall impair either party's rights with respect to any liabilities, whether or not liquidated, of one party to the other already accrued.

(e) All rights and remedies of each party specified in this contract are in addition to that party's other rights and remedies.

(f) Contractor shall remain as independent Contractor and shall have no power, nor shall Contractor represent that Contractor has any power, to bind Owner or to assume or to create any obligation express or implied on behalf of Owner except as specifically authorized in advance by the Owner Engineer in connection with the performance of procurement services under Paragraph 5 of this Agreement.

(g) Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of the prohibition or unenforceability without invalidating the remaining provisions of this Agreement and any prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable the provision in any other jurisdiction. To the maximum extent permitted by applicable law, the parties to this Agreement waive any provision of law that renders any provision of the Agreement prohibited or unenforceable in any respect.

(h) Nothing in this Agreement will be deemed to create a joint venture or partnership between the parties.

(i) Contractor's performance shall in all ways strictly conform with all applicable laws, regulations, safety ordinances, labor agreements and working conditions to which it is subject, including, but not limited to, all federal, state and local non-discrimination employment provisions, and all local regulations and building codes.

(k) The parties and each of them recognize and acknowledge that Contractor operates out of, and is headquartered in Texas and approved execution of this Agreement from its offices in Texas.

Except for Services, Equipment, Parts or Rental provided, or to be provided, by Contractor in North or South America (the "America's"), this Agreement shall be governed by and interpreted in accordance with the laws of England and Wales, excluding conflicts and choice of law principles.

For Services, Equipment, Parts or Rental provided, or to be provided, by Contractor in the America's, this Agreement shall be governed by and interpreted in accordance with the substantive laws of the State of Texas, excluding conflicts and choice of law principles.

For any dispute arising in connection with this Agreement, the parties hereto shall attempt, within sixty (60) days (unless otherwise extended by mutual agreement of the parties) of receipt of the written notice of a dispute, to resolve the dispute by non-binding mediation. Mediation is a condition precedent to the institution of legal or equitable proceedings by either party, and it shall be conducted in accordance with the Construction Industry Mediation Rules of the American Arbitration Association in effect as of the date of this Agreement. Request for mediation shall be filed in writing with the other party to the Agreement and with the American Arbitration Association. The parties shall share the mediator's fee and filing fees equally. The mediation shall be held in San Antonio, Bexar County, Texas.

If the parties cannot resolve the dispute in mediation, the dispute shall be resolved by judicial reference pursuant to Section 151.001 et seq. of the Texas Civil Practices and Remedies Code. The complaining party shall file a petition in the applicable district court, or other court of original jurisdiction, and that petition shall be abated pending the decision of the judge. The proceeding shall be conducted in compliance with the Texas Rules of Civil procedure and the Texas Rules of Evidence. The cost of the referee shall be borne equally by each party. The referee shall be a retired judge or attorney with at least 10 years of experience in construction related matters and/or construction litigation, or any other individual that the parties agree has the qualifications and experience

Proposal # 1                                    – 7 –                                    April 17, 2014

necessary. The parties shall agree upon the referee within thirty (30) days of the demand for judicial reference. In the absence of proof of grounds for objection to the appointed general referee pursuant to applicable rules, any party brought into the judicial reference after the selection of the referee shall be deemed have consented to such selection. In the event the parties cannot agree on the selection of a referee, any party may petition the Bexar County Court for the appointment of a qualified retired judge or attorney as a general referee. The general referee's decision shall be made in accordance with the substantive law of the State of Texas and is binding on the parties as would a decision by a court. The decision shall be in writing, and shall contain written findings of fact, and, to the extent applicable, conclusions of law, and shall be reported to the court within twenty (20) days after the testimony is closed. Each party retains the same appeal rights of the referee's decision as if the decision were rendered by a trial court judge. The judicial reference shall be held in San Antonio, Bexar County, Texas.

In the event the parties become involved in litigation, judicial reference, or similar proceedings with each other arising out of this Agreement or other performance thereof in which the services of an attorney or other expert are reasonably required, the prevailing party shall be fully compensated for the cost of its participation in such proceedings, including the cost incurred for attorneys' fees and experts' fees. The attorneys' fee award shall fully reimburse all attorneys' fees actually incurred in good faith regardless of the size of a judgment, it being the

intention of the parties to fully compensate for all attorneys' fees and experts fees paid or incurred in good faith.

(l) This Agreement was negotiated pursuant to an arms-length transaction and is the product of joint drafting. It shall not be construed against any party more strictly than against the other party.

(m) CONTRACTOR AND OWNER KNOWINGLY, VOLUNTARILY, IRREVOCABLY, UNCONDITIONALLY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PERSON OR PARTY AND RELATED TO THIS AGREEMENT; THIS IRREVOCABLE WAIVER OF THE RIGHT TO A JURY TRIAL BEING A MATERIAL INDUCEMENT FOR CONTRACTOR AND OWNER TO ENTER INTO THIS AGREEMENT.

(n) This Agreement may be effectively executed by signature(s) on any number of counterparts.

 Plant Materials, LLC

18866-103 Stone Oak Pkwy
Suite 4
San Antonio, TX 78258

# Sales Order

| Date | S.O. No. |
|------|----------|
| 5/1/2014 | SSS014PM01S |

| Name / Address | Ship To |
|----------------|---------|
| Shale Support Services<br>105 Street A<br>Picayune, MS 39466 | Shale Support Services<br>1440-1550 US 11<br>Picayune, MS 39466 |

| P.O. No. | Project |
|----------|---------|
|  | SSS014PM-Picayun... |

| Item | Description | Ordered | Rate | Amount |
|------|-------------|---------|------|--------|
| Ironworker | Labor: Ironworkers Day Shift-$905.00/man/8 hr day - (6 men - weekly total = 7 days) | 1 | 38,010.00 | 38,010.00 |
| Ironworker-OT Hrs | Labor: Ironworkers Day Shift-$137.50/hr over 8 hr day - (6 men @ 4 hrs ea. day - weekly total = 7 days) | 1 | 23,100.00 | 23,100.00 |
| Ironworker | Labor: Ironworkers Night Shift $1200.00/man/8 hr day - (6 men - weekly total = 7 days) | 1 | 50,400.00 | 50,400.00 |
| Ironworker-OT Hrs | Labor: Ironworkers Night Shift- $225.00/hr over 8 hr day - (6 men @ 4 hrs ea. day  - weekly total = 7 days) | 1 | 37,800.00 | 37,800.00 |
| Equipment Rental | Equipment Rental-Generator $2500.00/month - (weekly total = 7 days) | 1 | 625.00 | 625.00 |
| Equipment Rental | Equipment Rental -Three (3) Welding Machine $1500.00/each= $4500.00/month (weekly total = 7 days) | 1 | 1,125.00 | 1,125.00 |
| Parts | All Materials will be invoiced at Cost plus OH + 10% |  | 0.00 | 0.00 |
| Parts | Welding Supplies (weekly total = 7days) Two weeks max | 1 | 1,900.00 | 1,900.00 |
| Equipment Rental | 10# Fork Lift (weekly total = 7 days) | 1 | 1,175.00 | 1,175.00 |
| Supervisor | Labor: Supervisor $1200.00/day (weekly total = 7 days) | 1 | 8,400.00 | 8,400.00 |
| Parts | Welding Gases-Oxygen and acetylene will be provided by Shale Support Services |  | 0.00 | 0.00 |
| Equipment Rental | Crane - 70 Ton @ $170.00 per hour with 8 hour minimum - Total cost TBD |  | 0.00 | 0.00 |
| Equipment Rental | Crane - 40 Ton @ $120.00 per hour with 4 hour minimum - Total cost TBD |  | 0.00 | 0.00 |
| Terms | Terms: TBD  with signed final proposal |  | 0.00 | 0.00 |

| Total | $162,535.00 |
|-------|-------------|

CAUSE NO. 2018CI11815

# PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

# EXHIBIT B

## Southton Rail Yard Silo Construction Contract
### (SRY Terminal Project)

This Southton Rail Yard Silo Construction Contract (the "Contract" or the "Agreement") is made on the date written above our signatures between:

**Contractor Name:  Plant Materials, LLC (Contractor) and**

**Owner Name:  Southton Rail Yard, LLC (Owner).**

### Contractor

Contractor Name: Plant Materials, LLC
Address: 300 East Sonterra Blvd., Suite 310
City: San Antonio, State: Texas, Zip: 78258
Work Phone Number: (210) 569 9262
Fax Number: (210) 497 7752
Email Address:  alec@robertober.com (Alec Woodson- Project Development), tdj@robertober.com (Tony DeJoseph- COO)
License Number: Texas Board of Professional Engineers (Registration # F-15459), Texas Board of Architectural Examiners (Registration No. BR15548), MSHA contractor (Registration: Contractor No. T-633)
Contractor Name: Plant Materials, LLC is licensed as a corporation in the state of Texas
Contractor Name: Plant Materials, LLC will be referred to as "Contractor" throughout this agreement.

### Owner

Owner Name: Southton Rail Yard, LLC
Address: 12070 Center Road
City: San Antonio, State: Texas, Zip: 78223
Work Phone Number: (210) 633 9069
Fax Number: (210) 633-9099
Owner Name: Southton Rail Yard, LLC is organized as a corporation in the state of Louisiana.
Owner Name: Southton Rail Yard, LLC will be referred to as Owner throughout this Agreement.

### Owner's Representative  T. B. D.

Owner will be represented by Name of _____ N/A _____ (Owner's Representative) as described in this agreement.
Name of representative: _____
Address: _____
Address: _____
City: _____ , State: _____ Zip: _____
Day Phone Number: _____
Cell Phone Number: _____
Fax Number: _____
Email Address: _____
Name of representative: _____ will be referred to as

Owner's Representative throughout this agreement.

Page 1

## The Construction Site

Address or legal description: 12070 Center Road (exact site to be designated by Owner)
City:                         San Antonio, Texas  78223

## I. Project Description

A.      For the price identified below, Contractor agrees to build, fabricate, construct, install, sell, deliver and commission for Owner foundations for industrial silos, truck scales, and an 800 ton per hour rail unloading system per an Owner approved scope of work detail to be included as Schedule A (identified as "the Project" in this Agreement). The work to be performed hereunder shall be prosecuted with due diligence and in a good and workmanlike manner. Except for Owner-supplied items, if any, specifically provided herein, Contractor shall furnish all labor, materials, and facilities necessary to build, fabricate, construct, install, sell, deliver and commission the Project.

Exclusions:

Unless specifically agreed to by the Parties in a written Change Order, the Project does not include:

Geotechnical assessment of proposed location, all compacted fill and drainage systems as required, road paving, site development (drainage, detention or irrigation ponds), incoming utilities and their disconnects and distribution, earthworks, culverts, aprons, sidewalks, civil design, site civil work SWPPP design, permit, or implementation.

Utilities and panels into the "control building": water, electric, including power distribution, gas and propane

Septic or sewer

## II. Contract Price

A.      In addition to any other charges specified in this agreement, Owner agrees to pay Contractor $ 2,630,062.80    for completing the Work described as the Project.  Price does not include tax which is to be paid by Owner.

## III. Scheduled Start of Construction

A.      Work under this agreement will begin within 7 Calendar Days after the following contingencies have been met:

1.      Complete Plans and Specifications have been approved and initialed by both Owner and Contractor.

2.      Owner has obtained a construction loan or other financing acceptable to Contractor.

Page 2

3.     Permits delineated in part 1.A., have been issued by the appropriate regulatory authorities.

4.     The contract has been signed by Owner and Contractor.

## IV. Scheduled Completion of Construction

A.     Work under this agreement will be Substantially Completed within 45 Calendar Days after the date construction begins.

## V. Documents Incorporated

A.     The Glossary of Terms which follows the signatures is incorporated into this contract as though included in full as part of this agreement.

B.     This agreement incorporates by reference certain documents which define and describe the Work to be done. The following documents are incorporated as though included in full as part of this agreement.

**1.     Specifications [this information was obtained from Contractor's bid; fill in detail; list any additional drawings or docs if appropriate]**

Specifications dated ____ / ____ / ____
Consisting of  sheet(s)
Prepared by
Last changed on ____ / ____ / ____
And further identified as

*PER SCOPE OF WORK/DESIGN ENGINEERING & CONSTRUCT of FOUNDATIONS & REIN PIT ONLY.*

**2.     Rendering 1**

Detailed Drawings dated ____ / ____ / ____
Consisting of  sheet(s)
Prepared by
Entitled
And further identified as

**3.     Rendering 2**

Detailed Drawings dated ____ / ____ / ____
Consisting of  sheet(s)
Prepared by
Entitled
And further identified as

**4.     Price Work**

**5.     Schedule**

Schedule dated ____ / ____ / ____          (90 days maximum)
Consisting of  sheet(s)

## VI. Ownership of Plans

Page 3

A.   The Specifications, Rendering and any of Contactor's working drawings of the Project are and will remain the property of Contractor. Owner agrees that it will not construct other silos with any other contractor using these Specifications and Renderings, Contractor's working drawings or any modifications thereof or make them or any duplicates thereof available to any other person. Contractor shall deliver a set of as-built drawings in electronic (PDF) format for the Project to Owner upon completion of the Project.

## VII. Plans on Site

A   Contractor will keep a full set of Project Plans available (for Reference) on-site to authorized personnel during the period of construction.

## VIII. Scope of Work

A.   The work shall include all equipment, construction equipment, labor, workmanship, inspection, manufacture, fabrication, installation, delivery, transportation, storage, assembly, erection and other items or tasks that are set forth in the Contract Documents to construct the Project. It is understood and agreed that the work shall include any incidental work that can reasonably be inferred as required and necessary to complete the Project in accordance with the Contract Documents, unless specifically excluded in Paragraph I of this contract.

B.   Contractor shall supervise and direct the Work and accepts responsibility for construction means, methods, techniques, sequences and procedures required to complete the Project in compliance with the Contract Documents.

C.   Contractor is responsible for coordination of the various trades and deliveries of equipment, materials and supplies to minimize interference, which could delay the Work or pose a hazard to life or property. Contractor shall be responsible for allocation of tasks between trades and will be the final authority on location regarding the Project and routing of equipment and storage of materials on the Job Site.

D.   Contractor will ensure that Subcontractors, their agents, and employees adhere to these Contract Documents. Contractor accepts responsibility for all Work performed under this contract, including Work performed by employees of Subcontractors. Contractor is fully responsible to Owner for the acts and omissions of any of Contractor's Subcontractors, to the same extent as if these persons were directly employed by Contractor. The work done by any Subcontractors of Contractor shall be subject to inspection by Owner and its representatives to the same extent as the Work of Contractor. Contractor will settle disputes among Subcontractors and between Contractor and Subcontractors so that disagreements do not delay completion of the Work or affect quality of the Work.

E.   Contractor shall use its best efforts to adopt and implement policies and practices designed to minimize Work stoppages, slowdowns, disputes or strikes. Except as may be specifically provided elsewhere in this or a separate agreement, Contractor is not liable to Owner for damages suffered by Owner as a result of Work stoppages, slowdowns, disputes or strikes. Contractor shall allocate labor tasks among the various trades in accordance with local custom, rules, jurisdictional awards, regulations, and decisions, regardless of any classification by the Contract Documents.

F.   Contractor shall provide on the Job Site during the period of construction a temporary chemical toilet or water closet, which shall be serviced no less than weekly. Upon completion of the Project, Contractor will remove temporary toilet facilities from the site.

G.   Contractor shall provide temporary elevators and lifts as may be required by construction personnel, including: Subcontractors, Material Suppliers, Inspectors, and Representatives of Owner. Elevators and lifts will

Page 4

comply with all federal, state and local Laws and ordinances in effect at the Job Site. Upon completion of the Project, Contractor will dismantle and remove temporary elevators and lifts.

H.      Contractor shall develop and present to Owner for approval (which shall not be withheld unreasonably), a site logistics plan drawn to scale, showing proposed secure and fenced areas, locations and types of temporary barricades, material storage and staging areas, property entrances used for material deliveries, and special material or equipment storage Requirements. This plan will include a description and proposed location for any temporary office, storage trailer, sanitary facilities, and parking for construction personnel.

I.      Contractor shall, in the performance of the work, comply, and cause all Subcontractors to comply with any easements, lease, right-of-way or other property interests that affect or govern the Job Site or any real property used for purposes of completing the work.

J.      Contractor shall not make any substitutions for Equipment or manufactures in the Specifications or Renderings without Owner's prior written approval, unless substitutions are designated as equivalents on the attached specifications.

## IX. Independent Contractor

A.      The relationship of Contractors to Owner shall be that of an independent contractor and shall in no event be construed or interpreted as being that of principal and agent, master and servant, or employers and employees, and the employees of each party shall not be deemed to be employees of the other party hereto for any purpose. Contractor agrees that it shall act as and be an independent contractor free and clear of any dominion or control by Owner in the manner in which said services are to be performed, and as such Contractor: (a) acts as the employer of any employee of Contractor by paying wages, directing activities, performing other similar functions characteristic of an employer-employee relationship; (b) is free to determine the manner in which the Work is performed, including the hours of labor of or method of payment to any employee; (c) is required to furnish or have its employees, if any, furnish necessary tools, supplies, or materials to perform the Work;  and (d) possesses the skills required for the Work;

## X. Job Site Safety

A.      Contractor will at all times take all reasonable precautions for the safety of employees and the public at the Job Site and will comply with all applicable safety Laws and regulations of federal, state, and local authorities (including building codes) and safety Requirements of Owner.

## XI. Hazardous Materials Used in Construction

A.      Except as provided elsewhere in the Contract Documents, Contractor is responsible for all Hazardous Materials brought to the Job Site by Contractor or Subcontractors.

## XII. Hazardous Materials Discovered on Site

A.      Except as provided elsewhere in the Contract Documents, Owner is responsible for all Hazardous Materials discovered on the Job Site so long as those materials were not brought on the Job Site by Contractor, Subcontractors, or anyone directly or indirectly employed by them. Nothing in this paragraph shall relieve Contractor from liability for negligence in handling or removing Hazardous Materials as required under the terms of this Agreement.

Page 5

B.      Except as provided in the Contract Documents or as agreed by mutual consent, Contractor shall not be required to perform Work relating to asbestos, polychlorinated biphenyl (PCB), radioactive material, toxic mold or any other Hazardous Material.

C.      Owner shall defend, Indemnify and hold harmless Contractor from and against all loss, liability, claims, costs, damage and economic detriment of any kind whatsoever, or expense (including attorney's fees) that arises out of or results from the discovery or existence of Hazardous Material on the Job Site, whether or not identified in the Contract Documents, provided such loss, liability, costs, damage and economic detriment is not the result of any negligent act or omissions of Contractor, Subcontractors or anyone directly or indirectly employed by them. Indemnification by Owner under this paragraph shall apply even if Owner is in no way responsible for the loss to Contractor.

### XIII. Compliance with Law

A.      Contractor and Owner mutually commit to use reasonable care to meet the Requirements of state, federal and local Law when discharging their responsibilities under this Agreement.

B.      If Law enacted after the Contract Date changes the Scope of Work under this Agreement, Contractor and Owner will execute a Change Order adjusting the Contract Price and Contract Time to accommodate the change in the Scope of Work.

### XIV. Survey

A.      Owner will employ an engineer or licensed land surveyor to establish lines, points and levels adequate to layout alignment and elevations for the Project. Owner is responsible for accuracy of the survey marks and other site information supplied to Contractor. Contractor shall promptly notify Owner of any discrepancies found in survey markers or other site information supplied by Owner.

B.      If Contractor suffers any loss or delay due to inaccuracy of the Job Site survey supplied by Owner, Contractor shall be entitled to an adjustment in the Contract Price and Contract Time, including damages for delay, shutdown and startup expense, lost profits and consequential damages.

C.      Contractor shall maintain and preserve all survey monuments, markers, hubs and stakes on the Job Site until authorized or required to remove them. If such marks are lost, moved or destroyed while still needed to complete the Work, Contractor will have the marker reset by a licensed land surveyor or engineer at no cost to Owner.

D.      Owner will provide Contractor with all relevant site information available to Owner, such as information about soil conditions, easements, utility lines (whether on or adjacent to the site), floodplain maps, fault maps, and existing improvements. These are not Contract Documents and Owner makes no warrant on the accuracy or information provided to Contractor under the terms of this paragraph. Owner agrees to compensate contractor for any required re-surveyor site measurements required due to inaccurate surveys passed to contractor by the owner.

### XIV. Layout

A.      Contractor shall be responsible for alignment and elevation of the Work and will set grade stakes, batter boards, and other working points, lines and elevations required to complete the Project as described in the Contract Documents.

### XV. Permits and Fees

Page 6

A.    Contractor shall secure all permits, licenses and renewals required by government authority to complete construction of the Project. If permits are required for Subcontracted Work, Subcontractors will secure those permits. Owner shall assist Contractor in responding to requests for information from the permit-issuing authority. Contractor shall provide Owner a copy of each permit, license and renewal issued by government authority for the Project.

B.    Owner will pay the building permit fee, Plan check fee, and charges levied by government for testing, Inspection and Re-Inspection of the Project.

C.    Except as provided elsewhere in this agreement, Owner will pay all fees and application charges imposed by government authority, including, but not limited to, grading permit fees, drainage permit fees, traffic control charges, thoroughfare charges, impact fees, special district fees, sewer fees, water fees planning fees, school fees, elevator permit fees, charges for temporary access or use of the public right of way, charges for document processing, hearings, certifications, and any applicable sales taxes due on equipment as invoiced by the contractor to be remitted by the contractor on the owner's behalf.

D.    Except as provided elsewhere in this agreement, Owner will pay all application fees and connection charges imposed by utility companies or government agencies for bringing service to the Job Site, and for connecting gas, water, electricity, phone, cable, sewer, and drainage lines. Owner will pay for temporary water and power in connection with compaction of soil for foundation work.

E.    Except as provided elsewhere in this agreement, Owner will secure all approvals for the Project that are required by government authority, including planning, easements, remediation, environmental, and zoning approvals.

## XVI. Subcontractors

A.    Contractor shall, prior to the start of the Project, notify Owner in writing of the intended selection of any Subcontractor, notify Owner in writing of the intended selection of such Subcontractor and inform Owner generally what portion of Work such Subcontractor is performing. Owner shall have the discretion to accept or reject any such Subcontractor which discretion shall be exercised promptly and not in an unreasonable manner.

B.    In addition to the requirements of Section VIII. C Scope of Work, and without in any way relieving Contractor of its full responsibility to Owner for the acts and omissions of Subcontractor and Sub-Subcontractors, each Subcontract and Sub-Subcontract shall contain all provisions necessary to enable Contractor to comply with the terms thereof, including that such Subcontract or Sub-Subcontract may be assigned to Owner without the consent of the respective Subcontractor or Sub-subcontractor.

## XVII. Temporary Utilities

A.    Contractor shall provide, maintain and remove from the Job Site upon final completion of the work, all temporary offices, structures for the use of its employees, sheds and storage facilities, complete with all related utilities (i.e. electricity, water, communication, cable, telephone, water and sewer.) contractor shall provide all temporary utilities necessary to perform and test the work. Contractor shall maintain its work and storage areas in an orderly condition.

## XVIII. Permanent Utilities

A.    Owner shall secure and pay for Installation, connection, and modification of permanent electric, water, phone, cable, sewer and gas service as required for the completed Project.

Page 7

## XIX. Job Cleanup

A.      Contractor shall regularly remove from the Job Site and storage areas all surplus material, waste and debris resulting from the Work. Construction debris shall be removed to a legal refuse collection site with disposal or recycling fees paid by Contractor. At completion of the Work, Contractor shall, in addition, remove from the Job Site all tools, equipment and scaffolding brought to the Job Site by Contractor or Subcontractors. At Substantial Completion, exposed finishes of windows, doors, floors, walls, ceilings, fixtures and trim shall be cleaned and free of grime, stains, over spray, dirt and dust.

B.      Contractor shall provide a trash disposal facility on the Job Site for use by construction personnel. The on-site trash facility provided by Contractor shall be of an appropriate size for the Project and placed in a location approved by Owner. All construction debris shall either be placed in the trash facility provided by Contractor or hauled to a legal disposal site, at the discretion of Contractor. When any trash container provided by Contractor is full, contents shall be removed to a legal disposal facility at the expense of Contractor.

## XX. Project Superintendent

A.      Contractor shall employ a competent Superintendent and any necessary assistants or alternates, all approved by Owner or Owner's Representative. The Superintendent shall not be changed except with the consent of Owner or Owner's Representative, unless the Superintendent is discharged by Contractor. The Superintendent shall have authority to represent Contractor in all matters relating to the Project. Communications with the Superintendent shall have the same force and effect as direct communication with Contractor.

B.      The Project Superintendent shall be able to read, write, and communicate in the English language.

## XI. Emergency Response

A.      In the event of any Emergency endangering life or property in any way relating to the work, the Project or the Job Site, whether on the Job site or otherwise, Contractor shall take such action as may be reasonable and necessary to prevent, avoid or mitigate injury, damage or loss and shall, as soon as possible report any such incidents, including Contractor's response thereto, to Owner. If Contractor has not taken reasonable precautions for the safety of the public, personnel on the Job Site, or the protection of the Work, and such failure creates an emergency requiring immediate action, then Owner may, but shall be under no obligation to , take reasonable action as required to address such emergency. The taking of any such action by Owner, or Owner's failure to take any action, shall not limit Contractor's liability.

## XXII. Owner's Responsibilities

A.      Owner affirms that Owner has the right to enter into this Agreement and has the right to contract for construction of the Project on the Job Site. Owner shall pay all taxes and assessments due on the Job Site during the period of construction and shall take all reasonable actions required to protect marketable title to the Job Site.

B.      Owner will ensure that Owner's Representative responds in writing and with reasonable promptness to written requests from Contractor for information relevant to completion of the Work. Contractor is authorized to rely on written responses from Owner's Representative.

Page 8

C.     Owner shall have sole responsibility to secure financing for the Project and shall pay all fees, charges, or other costs of such financing, including Inspection fees charged by any lender. The nonperformance of any lender shall not affect the obligation of Owner to Contractor. Owner hereby authorizes and directs any lender on the Project to furnish Contractor with full information on undisbursed loan proceeds when requested by Contractor.

D.     Owner will not interfere with or permit others to interfere with, stop, hinder, or delay completion of the Work by Contractor or Subcontractors except as provided under this Agreement.

## XXIII. Authority of Owner's Representative

A.     Owner's Representative has authority to administer the contract, make construction decisions on behalf of Owner, and is the primary authority on issues of compliance with the Specifications and Renderings, quality of workmanship, materials used, manner of performance, and rate of progress on the Project.

B.     After the Contract Date, Owner shall make no change in the responsibilities or authority of Owner's Representative without consent of Contractor.

C.     Owner's Representative shall have the right to visit the Project and view Work in progress at any time. Any Defective Work found or suspected, either as the result of a site visit or otherwise, shall be reported promptly to Contractor. No actions taken or statements made during site visits shall relieve Contractor of obligations described in the Contract Documents.

D.     Communication between Contractor and Owner shall be initiated through Owner's Representative unless direct communication is required by Law or Contract Documents. Unless otherwise authorized by Contractor, communications between Owner's Representative and Subcontractors or Material Suppliers shall be through Contractor. Communications by Contractor and Subcontractors with Separate Contractors shall be through Owner's Representative. Communications between Contractor and consultants to Owner's Representative shall be through Owner's Representative.

E.     Owner's Representative shall have the authority to reject and order removed any portion of the Work which does not conform to the Contract Documents.

F.     Owner's Representative shall have authority to conduct Inspections in connection with Beneficial Occupancy and to determine the dates of Substantial Completion and Final Completion.

## XXIV. Representations by Contractor

A.     Contractor shall use its expertise, skill and attention to complete the Work in a timely manner consistent with the Contract Documents.

## XXV. Contractor Investigations of the Site and Differing Site Conditions

A.     Contractor represents that it has investigated, examined, inspected, and thoroughly familiarized itself (relative to its scope responsibilities) with the Job Site and adjoining premises in connection with the Work to be performed, and that it has thoroughly informed itself as to any connected difficulties known to Contractor or that should have become known to Contractor pursuant to Contractor's investigation. Contractor further represents that Owner has made no representation of any kind or nature with respect to the Job Site or adjoining premises which are not contained in this Agreement. Commencement of the Work or any portion thereof by Contractor shall be conclusive evidence that the Job Site is in proper condition for the Work. By entering this Agreement with Owner, Contractor further warrants and represents that it has taken into account all reasonably

Page 9

foreseeable climatic conditions, the availability and cost of labor, Equipment, and Construction Equipment, Owner's scheduling requirements, and potential Project congestion or disruption caused by the work of others proceeding simultaneously with Contractor.

B.      Contractor further agrees that it has made all investigations and inspections that it deems necessary to perform the Work in accordance with the Project Schedule, and understands the climate, terrain and other difficulties that it may encounter in performing the Work in accordance with the Project Schedule. Contractor warrants that it has the experience, resources, qualifications and capabilities at its disposal to perform the Work in accordance with the Project Schedule. Notwithstanding the foregoing, should concealed or unknown conditions be encountered below that surface of the ground or in existing structures and are at variance with information, if any, furnished by Owner in writing under the Contract Documents, or which are of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this Agreement, then Contract Price, and Contract Completion Date, may be adjusted by Change Order; provided, however, that a condition precedent to any such adjustment by Change Order shall be, in unknown condition within twenty-four (24) hours of discovery, and before the condition is further disturbed. Contractor may request additional funds to compensate and subcontractors for additional work required due to inaccuracies in material data and information supplied by owner.

## XXVI. Access to Site by Owner

A.      While Work is in preparation or in progress, Contractor shall, at all times, provide access to the Job Site to Owner and those authorized by Owner. Contractor shall provide safe and proper facilities for such access. Owner and those authorized by Owner shall have the right to inspect all Work done and all materials, equipment and fixtures furnished, installed, or stored in and about the Job Site.

B.      If Owner or anyone authorized by Owner is on the Job Site while Work is in preparation or progress and causes a delay or disruption of the Work or does damage to the Work, for which Contractor is in no way responsible, Contractor shall be entitled to extra compensation or an extension of time, or both.

## XXVII. Payment Terms

A.      Owner will pay to Contractor the Contract Price in installments in accordance with progress made for work done on the project as outlined in section XXVIII below.

## XXVIII. Progress Payments

### A. Schedule of Progress Payments

1.      ~~Each progress payment will cover Work done during the pay period. The amount of each progress payment will be based on the value of Work completed.~~ The payment schedule will be as follows:
1st Payment = Signed Contract +30% (First business day after receipt = the "Project Start").
2nd Payment = on 30 days after Project Start Date ~~10%.~~ 20%
3rd Payment = on 60 days after the Project Start Date ~~30%.~~ 20%
4th Payment = on 90 days after the Project State Date ~~30%.~~ 30%

2.      Payments will be made monthly on the 1st business day of each month. If a progress payment would be due on a legal holiday, the payment will be made on the next business Day after that holiday.

### B. Processing of Progress Payments

1.      No later than 7 Calendar Days before a progress payment is due under the terms of this agreement, Contractor shall submit to Owner's Representative an application for payment itemizing charges for Work done in previous pay periods and for Work done in the current pay period, including adjustments to the Contract Price resulting from approved Change Orders or other changes required by Owner. Within a reasonable time after receipt of a request for payment, Owner's Representative will inform Contractor and Owner that a Certification of Payment has been issued covering all, part, or none of the payment request. If any portion of an application for payment is not approved, Contractor shall be entitled to payment on the portion approved.

2.      Once a Certificate of Payment is issued by Owner's Representative, Owner is required to issue payment to Contractor in the amount approved and in compliance with the terms of this contract.

3.      The amount of each progress payment shall be based on the value of construction put in place during the payment period as calculated from an approved Schedule of Values.

### C. Approval of Progress Payments

1.      Contractor acknowledges that Owner's Representative may decline to approve the portion of any request for payment which includes: (1) Charges based on Defective Work not remedied, or (2) Work by a Subcontractor or materials from a Supplier for which Contractor is withholding payment pending resolution of a dispute.

2.      Contractor acknowledges that Owner's Representative may decline to approve all or any portion of a request for payment (1) After legal Claims relating to the Project have been filed and served on Contractor or Owner, (2) After Contractor is delinquent paying Subcontractors, employees or Material Suppliers, (3) After failure of Contractor to make contributions required by state or federal Law or by collective bargaining agreements, (4) If it becomes apparent that the Work cannot be completed for the unpaid balance of the Contract Price or finished by the Contract Completion Date, (5) If Contractor is responsible for substantial damage to Work of Owner or a Separate Contractor, or (6) If payment would exceed the total liability of Owner for the Project after deducting a reserve for liquidated damages reasonably expected.

3.      Promptly on disapproval of all or any portion of a payment request, Owner shall provide to Contractor written notice of denial identifying for each line item denied: (1) The amount withheld, (2) The Defect or reason for withholding, (3) The remedial action required to cure the Defect, and (4) Documentation needed to reestablish an obligation of Owner for payment. Within 7 Calendar Days after Contractor cures the Defect and provides appropriate documentation that is approved by Owner's Representative, Owner shall pay Contractor within 7 Calendar Days for the value of line items thus approved.

4.      Unless otherwise provided in the Contract Documents, applications for payment may include, at the option of Contractor, itemized charges for materials and equipment not yet incorporated in the Work but delivered and suitably stored on the Job Site. Application for payment for stored materials, material deposits and equipment shall include a bill of sale or other confirmation that stored materials and equipment are the property of Owner.

5.      Each application for payment shall be submitted on the form approved by Owner.

### D. Discharge of Liens and Payment of Subcontractors

1.      Contractor warrants that, upon payment, Owner shall receive clear title to all Work identified in the application for payment, free and clear of all liens and Claims, including Claims of Subcontractors, employees or Material Suppliers. Contractor also agrees that this vesting of title in Owner does not impose any obligation

Page 11

on Owner or relieve Contractor from any obligation under this contract. Contractor shall remain responsible for damage to or loss of both the Work and stored materials until Final Completion.

2.      Contractor warrants and guarantees that no Work, materials, or equipment covered by a request for payment has been acquired by Contractor or by any other person performing the Work or furnishing materials or equipment for the Project subject to an agreement under which an interest therein, or an encumbrance thereon, has been retained by seller or otherwise imposed by Contractor.

3.      Contractor shall furnish, with each application for payment, executed partial waivers of liens from Contractor and each Subcontractor and Material Supplier to the Project in the amount of the application for payment. Waivers of liens shall be in a form satisfactory to Owner, title insurer, and lenders. In lieu of a waiver of lien, contractor may submit a Bond by a Surety company licensed to do business in the state of Texas guaranteeing satisfaction of any lien rights claimed by Subcontractors, Material Suppliers, or employees.

4.      Contractor shall disburse funds received from Owner among Subcontractors and Material Suppliers in proportion to the Work done and materials received for the Project during the pay period. Contractor shall retain or hold back payment to Subcontractors in no greater proportion than the proportion of Retainage in payments made by Owner to Contractor. By separate agreement, Contractor shall require each Subcontractor on the Project to make payments to Sub-subcontractors and Material Suppliers in a similar manner.

### E. Schedule of Values

1.      No later than 30 Calendar Days before the first progress payment is due, Contractor shall     submit a draft Schedule of Values for approval by Owner's Representative. When approved, the Schedule of Values shall be the basis for calculating amounts due in progress payments. The units installed or the estimated percent completed during the pay period multiplied by the unit value equals the payment earned during the pay period.

2.      When requested by Owner's Representative, Contractor shall supply documentation to support figures in the draft Schedule of Values. When requested by Owner's Representative, Contractor shall submit a revised draft Schedule of Values that overcomes the reasonable objections of Owner's Representative. The draft Schedule of Values is approved as submitted if Owner's Representative makes no objection within 10 Calendar Days of submission. Contractor shall make no application for progress payment until a Schedule of Values has been approved by Owner's Representative.

3.      Contractor shall draft a revised Schedule of Values for approval by Owner's Representative when, in the opinion of Owner's Representative, changes to the Contract Documents or the Contract Price require a revised Schedule of Values.

4.      Costs which Contractor may incur prior to the start of construction, such as Bonds, permits and mobilization expense, may, at the option of Contractor, be included on a separate Schedule of Values and submitted for approval with a request for expedited consideration. When approved by Owner's Representative, this separate Schedule of Values becomes a supplement to any other Schedule of Values that may be approved and is a valid basis for an immediate application for payment.

### XXIX. Retainage

A.      Progress payments to Contractor shall be reduced by the amount set out in this contract for Retainage. Except as otherwise provided in this agreement, all Retainage shall be released to Contractor no later than 30 Calendar Days after Final Completion of Project.

Page 12

B.     Except as otherwise provided in this agreement, Owner shall retain 10 percent of the total amount due on progress payments.

C.     When any Subcontractor has finished Work in a manner that complies with the Contract Documents, Owner may release to Contractor all Retainage attributable to Work performed by that Subcontractor. No such release of Retainage shall be made without written approval from each Surety company furnishing a Bond for either Contractor or the Subcontractor affected.

D.     Retainage shall be released to Contractor upon Substantial Completion of the Project except for (1) An amount equal to 200 percent of the estimated value any Work remaining to be completed on a Punch List developed under the terms of this contract, and (2) Any amount required to ensure compliance with Warranty provisions of this contract. All Retainage shall be released to Contractor upon Project completion as evidenced by Commissioning and Owner Acceptance.

E.     Contractor shall disburse pro-rata the full amount of Retainage due Subcontractors and Material Suppliers within 10 Calendar Days after receipt of Retainage from Owner.

F.     No Retainage will be withheld under this contract upon tender by Contractor of a Retainage Bond satisfactory to Owner and naming Owner as obligee, issued by a Surety company authorized to issue Surety Bonds in the state of Texas, in the amount of the Retainage to be released and conditioned upon Substantial Completion of the Work by Contractor.

### XXX Title and Risk of Loss

A.     Title to all or any portion of the Work shall pass to Owner upon the earlier of (i) payment by Owner therefor, or (ii) incorporation of such Work into the Project. Transfer of title to Work shall be without prejudice to Owner's right to reject Defective Work, or any other right in the Agreement. Contractor warrants and guarantees that legal title to and ownership of the Work and the Project shall be free and clear of any and all liens, claims, security interests or other encumbrances when title thereto passes to Owner.

B.     Notwithstanding passage of title as provided in Subsection A above, Contractor shall bear the risk of loss and damage to the Work until Substantial Completion of the Work. In addition, upon Contractor's receipt of Owner-Provided Equipment, Contractor shall bear the risk of loss and damage for such Owner-Provided Equipment until Substantial Completion of the Work, including maintenance and care for Owner-Provided Equipment until Substantial Completion of the Work, in accordance with the manufacturer's and Owner's recommendations and procedures.

### XXXI. Interest

A.     Payments due and not paid under the Contract Documents shall bear interest from the date payment is due at a monthly rate of percent.

B.     Payment of interest does not abrogate or replace any other rights Contractor may have under this agreement.

### XXXII. Grounds for Withholding Payment

A.     Owner may withhold payment due Contractor for Defective Work which has not been corrected in compliance with the terms of this agreement. Defective work is work to be identified prior to Final Completion. Otherwise, such deficiencies to be handled as warranty work.

B.     Owner may withhold payment due Contractor on the filing of a legal Claim against Contractor by any third party if the Claim relates to the subject matter of this contract and (1) May result in a lien on the Project, or (2) May result in a judgment for damages against Owner. Filing of a legal Claim shall not constitute grounds to withhold payment if Contractor has insurance coverage, which would prevent loss to Owner from the legal Claim made.

C.     If Owner withholds any payment under terms of this agreement, Owner will notify Contractor in writing of the amount being withheld, the reason why payment is withheld, and what must be done to release the payment otherwise due.

D.     Grounds entitling Owner to withhold certain amounts due Contractor under this agreement shall not relieve Owner from the obligation to pay Contractor other amounts then due and shall not relieve Owner of the obligation to pay in full when the reason for withholding payment no longer exists.

## XXXIII. Final Payment

A.     Contractor will submit an application for final payment and will notify Owner's Representative when the Work has been completed. Owner's Representative will issue a certificate of completion on determination that the Project is complete and in compliance with the Contract Documents. When the certificate of completion is issued, the entire unpaid balance of the contract amount, including any Retainage, is payable to Contractor.

B.     Owner has no obligation to make final payment until unconditional waivers of lien in a form satisfactory to Owner, lenders and Sureties have been received from Contractor, Subcontractors, vendors, tradesmen, and all Material Suppliers with lien rights on the Project. Contractor may furnish a Bond satisfactory to Owner in lieu of waivers of lien.

C.     Owner has no obligation to make final payment until all as-built Drawings, certificates, warranties and job records required by the Contract Documents have been submitted to owner.

## XXXIV. Changes in the Work

A.     No change in the Work to be performed on the Project (including Modification, clarification, interpretation or correction of the Specifications or Renderings) shall be made without mutual agreement and a written Change Order signed by Contractor and Owner identifying the change, the cost of the change, and the effect on Project Schedule, if any.

B.     The charge for Extra Work shall be the normal selling price Contractor charges for similar changes on other jobs.

C.     No Claim for payment for Extra Work and no claim for additional time to complete the Work shall be recognized under this Agreement without a written Change Order or a notice of Claim. Failure by Contractor to assert the right to a written Change Order or a Claim within 30 Calendar Days after beginning Work on a change in the Work shall constitute waiver by Contractor of the right to additional compensation and waiver of the right to additional time to complete a change in the Work. No act or omission of either Contractor or Owner shall be interpreted as waiver of the Requirement for a written Change Order or notice of Claim, nor shall any Claim that Owner has been unjustly enriched support a Claim for a constructive Change Order. The provisions of this paragraph are the essence of this agreement.

D.     Failure of Contractor and Owner to agree on the terms of a Change Order shall be resolved under the provisions of this agreement which cover Claims and disputes.

Page 14

E.      Should Contractor and Owner fail to agree promptly on the terms of a Change Order, Contractor shall be paid, pending resolution of the dispute, the portion of the cost of the change not in dispute, including the costs of time and materials required to execute the change. Payments required under this paragraph shall be made as the Work progresses, concurrently with progress payments.

## XXXV. Cooperation of the Parties

A.      Owner and Contractor acknowledge that open communication and cooperation will required to complete the Project on time, as estimated, and in compliance with the Contract Documents. Contractor and Owner each agree to identify a representative who will be available to resolve minor problems, answer questions and reach mutually acceptable solutions. The individuals identified by Contractor and Owner shall try to reach informal agreement on problems as they arise but are under no obligation to do so.

B.      Both Contractor and Owner pledge that their relations will be conducted with courtesy and consideration in an environment characterized by mutual respect. Owner pledges to respond promptly to requests by Contractor for guidance, assistance and payments when due and agrees to extend to Contractor the deference and latitude a dedicated professional deserves. Contractor pledges to commit the skill and resources required to complete the Project in a manner that complies with both the letter and spirit of the Contract Documents and enhances the reputation of Contractor for dependability and professionalism.

## XXXVI. Job Conferences

A.      Prior to the start of construction, Contractor and Owner shall hold a pre-construction conference to identify: (1) The people who will be involved in construction of the Project, their chain of authority, addresses, telephone numbers, fax numbers and email addresses to be used when requesting information or giving notices, (2) The proposed construction Schedule, (3) Procedures for approving Shop Drawings, product data and Submittals, (4) Procedures for handling Change Orders, (5) Construction Site Requirements such as dust and erosion control, storm water management, Project signs, clean up and housekeeping, temporary facilities, utilities, security, and traffic, (6) Safety Requirements and procedures, (7) Quality control, testing, Inspections and notice Requirements, (8) Inspection procedures, and (9) The handling of payment requests.

## XXXVII. Defective Work

### A. General Requirements

1.      On written notice from Owner's Representative, Contractor shall promptly remove from the Job Site all Work or materials not in compliance with the Contract Documents, whether or not such rejected Work or materials are incorporated in the Project. Contractor shall promptly repair or replace such rejected Work or materials at no cost to Owner.

### A. Rejected Work - Contractor's Obligations

1.      Contractor shall bear all expenses related to the correction of rejected Work and replacing rejected materials, including the expense of making good all Work of Contractor, Owner and Separate Contractors destroyed or damaged by the corrections and replacements.

### A. Rejected Work - Contractor's Rights

1.      If Contractor disagrees with a decision on rejection of Work or rejection of materials, Contractor may proceed with corrections under protest and invoke the provisions of this agreement which cover dispute

Page 15

resolution. If such rejection of Work or materials is found to be without merit or with no adequate foundation Contractor shall be entitled to a Change Order for Extra Work and Owner shall pay all costs associated with corrections completed under protest.

2.    If Contractor disagrees with a decision on rejection of Work or materials, Contractor is entitled to an expedited resolution of the issue under the provisions of this agreement which cover dispute resolution. Pending resolution of this dispute, the obligation of Contractor to make correction is suspended. The Contract Time, if any, is extended for the period the dispute remains unresolved.

## XXXVIII. Call-Backs

A.    On written notice from Owner within 30 Calendar Days after Substantial Completion (the call-back period), Contractor shall promptly repair or replace any portion of the Work which becomes Defective due to faulty materials or workmanship.

## XXXIX. Warranty

Contractor warrants that the Work shall be free of Defects due to faulty material or workmanship for the period specified in this agreement.

### A. General Requirements

1.    Except as otherwise provided in this agreement, the warranty period shall begin from the date of Final Completion.

2.    Work done by Contractor in compliance with warranty provisions of this agreement does not extend the period of the warranty.

3.    Contractor shall deliver to Owner all warranties provided by vendors and manufacturers of materials and equipment used to complete the Project. Contractor shall have no obligation under warranties provided by others except to render any assistance that Owner may require in enforcing the terms of those warranties.

4.    Except as provided in this agreement, and to the extent permitted by Law, Contractor disclaims all warranties, whether express or implied, whether of fitness for purpose, merchantability, habitability or workmanlike completion.

5.    Failure of Owner to give notice of a breach of warranty within the warranty period constitutes a waiver of the right to repair or replacement by Contractor.

6.    To make a warranty Claim under this agreement, Owner must send a clear and specific written complaint to Contractor at the following address within 60 Calendar Days of discovering Defects, unless otherwise specified in the list of items covered under this warranty. Contractor shall make repairs, replacements and corrections promptly and at no expense to Owner.

Contractor Name:  Plant Materials, LLC
Address:  300 E. Sonterra Blvd.
Address:  Suite 310
City:  San Antonio           , State:  TX      Zip:  78258

Page 16

## B. Exclusions from Warranty

1. The warranty provided by this contract does not cover any of the following items or conditions:

    I.     Damages to personal property or bodily injury.

    II.    Damages or losses that result from soil movement that is covered by insurance or that is compensated for by legislation.

    III.   Insect damage.

    IV.   Damage or losses that result from overloading of any floor, wall, ceiling, or roof beyond the design capacity.

    V.    Damages caused or made worse by:

A.    Changes, additions, deletions, or any other alterations made to any part of the structure, systems, controls, and/or assemblies by anyone other than Contractor after the warranty term begins.

B.    Loss that results from failure of Owner to take timely action to mitigate or minimize damage.

2.    Contractor has no liability for incidental or consequential damages from breach of any warranty provided by this agreement insofar as the loss claimed is covered by insurance of Owner or for which Owner has a right of recovery from any other party.

## C. Basic Warranty Coverage

1.   ~~It is a breach of warranty if any equipment, material or design furnished, or workmanship performed by Contractor or any Subcontractor or Material Supplier, is found to be defective during the first year.~~

## D. Warranty on Major Structural Damage

1.   It is a breach of the major structural damage warranty where there is actual physical damage to designated load-bearing portions of the structure caused by the failure of such designated portions to perform to their load-bearing functions to the extent that it makes the structure unsafe or unusable for its designed rates and capacities during the first 7 years. The following items are designated load-bearing portions **[this section will need to be revised to be specific to major structural components of the Project]:**

| | | |
|---|---|---|
| I. | Foundation Systems and Footings | - Grid-type Floating Slab Settlement |
| II. | Silos | Anticipated will be noted on approval drawings |

A.    If Contractor claims that any instruction, act or omission of Owner or any representative of Owner or any agency of government, increases costs to Contractor, requires extra time or changes the Scope of Work, Contractor shall have the right to assert a Claim for such costs or time.

## XL. Notice of Claims

A.    No Claim by Contractor shall be considered unless Contractor provides Owner or Owner's Representative with a notice that there will be a Claim for additional compensation or an extension of time. This notice of Claim shall be made no less than 7 Calendar Days after Contractor recognizes ~~or should have recognized~~ that circumstances exist which support such a Claim. The notice of Claim shall include: (1) The date of the notice, (2) The date the basis for the Claim was discovered, (3) The circumstances that support the Claim, and (4) The estimated additional cost to Owner or additional time required to complete the Project.

B. If the Claim involves Extra Work, Contractor shall maintain detailed records which show each expense incurred, including payroll records and receipts for Subcontracted Work, materials and equipment. These detailed records shall be made available to Owner for verification while Work subject to the Claim is being performed.

C. The amount Claimed by Contractor shall be calculated in accord with provisions in this contract on charges for Extra Work.

## XLI. Arbitration

A. Any controversy or Claim arising out of or relating to this contract or contract warranty or the breach thereof which cannot be resolved by mediations shall be settled by arbitration administered by the American Arbitration Association under its Construction Industry Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Bexar County Texas.

B. Two copies of the demand for arbitration and attachments and the related fee shall be filed with the appropriate regional office of the American Arbitration Association. Copies of the demand and attachments shall be given to all other Parties to the dispute. The demand for arbitration shall be made within a reasonable time after the Claim or dispute has arisen, and in no event after the date when institution of legal or equitable proceedings based on such Claim or dispute would be barred by the applicable statute of limitations. All claims are limited to one (1) year after substantial completion.

C. Contractor and Owner agree to include in each contract for construction or design services on the Project a clause which requires that disputes under that contract be settled by arbitration administered by the American Arbitration Association under its Construction Industry Arbitration Rules.

D. Any representative of Owner or consultant to Owner or Contractor or any Subcontractor to Contractor on the Project shall have the same rights in any arbitration proceeding as are afforded by arbitration rules to Contractor and Owner. If more than one demand for arbitration is made by a Party with respect to the Project, all such Claims shall be consolidated into a single arbitration unless the Parties otherwise agree in writing.

E. If a Claimant in arbitration recovers less than 50 percent of the amount demanded in arbitration, Contractor and Owner agree that the Claimant shall pay all costs in arbitration, including the arbitrator's fees and the attorney's fees of the opposing Party.

## XLII. Insurance

### A. Certificates of Insurance

1. Contractor shall provide to Owner a certificate of insurance for each insurance policy required by this agreement. These certificates shall list Owner as the certificate holder.

2. Certificates of insurance shall be issued on a standard form such as ACORD Form 25-S or the equivalent.

3. Contractor shall permit no Subcontractor to begin Work on the Project until Owner has received certificates of insurance demonstrating that the Subcontractor has coverage of a like kind and with comparable limits to insurance coverage required of Contractor under this agreement.

### B. Waivers of Subrogation

1. Owner and Contractor waive all rights against each other for damages caused by fire or other perils to the extent covered by insurance except such rights as may exist to the proceeds from insurance held by Owner as trustee. Contractor shall require Similar waivers in Subcontracts for the Project.

## C. Insurance Details

1. Contractor may satisfy the policy limits set by this contract through any combination of underlying and excess liability (umbrella) insurance so long as the total coverage is not less than the policy limits specified in this contract. Any excess liability (umbrella) insurance coverage provided by Contractor must be written on an occurrence basis, offer coverage at least as broad as the underlying insurance, and have concurrent effective dates. Excess liability (umbrella) insurance provided by Contractor shall provide additional insured endorsements, blanket contractual coverage, and punitive damages coverage (unless prohibited by Law).

2. To the extent of the risks and obligations assumed by Contractor in this Contract, Contractor's insurance policies shall name Owner Group as an additional insured, shall contain a waiver of subrogation in favor of Owner Group, and shall be primary to and without contribution from any insurance policies or self-insurance maintained by the members of the Owner Group. Contractor shall, prior to performance of any Services hereunder, and upon renewal of such coverage while the Services are being performed, furnish Owner with current certificates of insurance, showing that the required insurance is in full force and effect. Any deductibles under any of Contractor's insurance policies shall be the sole responsibility of Contractor. IN THE EVENT THAT LIABILITY FOR ANY LOSS OR DAMAGE BE DENIED BY CONTRACTOR'S UNDERWRITER OR UNDERWRITERS, IN ALL OR IN PART BECAUSE OF BREACH OF SAID INSURANCE BY CONTRACTOR, OR FOR ANY OTHER REASON, OR IF CONTRACTOR FAILS TO MAINTAIN ANY OF THE INSURANCE COVERAGE HEREIN REQUIRED, CONTRACTOR SHALL RELEASE, PROTECT, HOLD HARMLESS, DEFEND AND INDEMNIFY OWNER GROUP AGAINST ALL CLAIMS, DEMANDS, COSTS AND EXPENSES, INCLUDING ATTORNEY'S FEES WHICH WOULD OTHERWISE BE COVERED BY SAID INSURANCE.

## D. Worker's Compensation and Liability Insurance

1. Minimum Contractor's liability coverage shall be: $1,000,000 combined bodily injury and property damage single occurrence limit, annual aggregate limit of $2,000,000, products and completed operations aggregate limit of $1,000,000, personal and advertising injury aggregate limit of $1,000,000, and include coverage for premises operations, independent contractors, contractual liability and broad form property damage.

2. Worker's Compensation and/or all other social insurance in accordance with the statutory requirements of the state, province or country having jurisdiction over Contractor's employees who are engaged in the Work.

3. Employer's Liability Insurance in the amount of $1,000,000 per claim.

4. Automobile Liability Insurance in the amount of $1,000,000 combined single limit, including owned autos, non-owned autos and hired autos.

5. Umbrella or excess liability coverage in excess of the preceding liability policies, with an each occurrence and aggregate limit of $10,000,000.

## E. Builder's Risk Insurance

Until the Work has been completed, delivered and accepted by Owner, the Work and Project shall be at Contractor's sole risk and, at the expense of the Contractor, be kept fully insured under a standard builder's risk insurance policy. Owner shall be named as an additional assured on such policy of insurance and the policy shall contain a waiver of subrogation clause in favor of Owner. The amount of such insurance will not be less than the aggregate of the amounts to be paid to Contractor by Owner, plus the value of any materials, outfitting, equipment and appliances furnished by the Owner, whether installed or not. Contractor agrees to prove this builder's risk insurance/ and Owner agrees to waive Performance Bond requirement.

## XLIII. Indemnity

A.  To the fullest extent permitted by law, and except as set out in subparagraph (b) below, Contractor shall indemnify, hold harmless and defend Owner, and all of its officers, directors, agents, parent, subsidiary or affiliated companies and their employees ("Owner Group", sometimes also referred to as "Indemnified Party" or "Indemnified Parties"), from and against all claims, damages, losses and expenses, including, but not limited to, attorney's fees, arising out of or resulting from bodily injury or death of any person, or property damage, including loss of use of property, arising or alleged to arise out of or in any way related to this Contract or Contractor's performance of the Work or other activities or Contractor, but only to the extent caused in whole or in part by any negligent act or omission (active or passive), and including gross negligence, of Contractor or Contractor's employees or the employees of any of its Subcontractors or Sub-subcontractors, or their agents or invitees.

B.  Notwithstanding the foregoing, to the fullest extent permitted by law, Contractor shall indemnify, hold harmless and defend Owner Group, from and against all claims, damages, losses and expenses, including, but not limited to, attorney's fees, arising out of or resulting from bodily injury to, or sickness, disease or death of, any employee, agent or representative of Contractor or any of its Subcontractors, without limit and without regard to the cause or causes thereof including the negligence or fault (active or passive) of any party or parties (including the sole, joint, gross or concurrent negligence of Owner Group). The indemnification obligations under this paragraph shall not be limited by any limitation on the amount or type of damages, compensation or benefits payable by or for Contractor under workers compensation acts, disability benefit acts or other employee benefit acts. Contractor shall procure liability insurance covering its obligations hereunder.

C.  In the performance of the services Work, Contractor agrees that neither Contractor nor Contractor's employees, agents or subcontractors will be covered by Owner's Workers' Compensation Insurance; and agrees that if the Work is performed in Texas or under Texas law and Contractor does not purchase Texas Workers' Compensation coverage, Contractor and Company will sign the DWC Form-85 (Rev. 10/05) (or similar) form establishing an Independent Contractor relationship under the Texas Workers' Compensation Act.

D.  Contractor will not use any of Owner's tools, fixed or mobile equipment, or vehicles without the prior express consent of Owner. In the event of consent and use of Owner's equipment, such use shall constitute acceptance of such items at on an "AS IS" basis at Contractor's sole risk and such equipment shall be returned in substantially the same condition as when such use commenced. Contractor shall defend, indemnify and hold Indemnified Parties harmless from and against all Claims arising out of the use by any Contractor or Subcontractor of any tier or condition of any such item, whether based on the negligence, breach, strict or statutory liability of an indemnified party or other cause.

E.  Subject to the Liquidated Damages provided herein, but notwithstanding anything else to the contrary in this Agreement, neither Owner nor Contractor shall be liable to the other for any consequential, incidental, indirect or punitive damages of any kind or character, including but not limited to , loss of use, loss of profit or loss of revenue, whenever arising under this Agreement, and no such claim shall be made by either Owner or Contractor against the other regardless of whether such claim is bases or claimed to be based on negligence

Page 20

(including sole, joint, active, passive, concurrent, or gross negligence), fault, breach of warranty, breach of contract, statue, strict liability or otherwise.

## XLIV. Payment and Performance Bonds

A.      ~~Contractor shall furnish to Owner within 10 Calendar Days after execution of this agreement a Performance Bond guaranteeing faithful performance of the contract. The penal sum of the Performance Bond shall be the Contract Price plus the value of Change Orders issued. Premiums for the Performance Bond shall be paid by Contractor. The Performance Bond shall be in effect 10 Calendar Days after this contract is signed by Owner and shall expire on completion of Work under this contract, including any warranty period.~~

B.      ~~Contractor shall furnish to Owner within 10 Calendar Days after execution of this contract a Bond guaranteeing payment of all obligations of Contractor arising under this contract. The penal sum of the Payment Bond shall be the Contract Price plus the value of Change Orders issued. Premiums for the Payment Bond shall be paid by Contractor. The Payment Bond shall be in effect 10 Calendar Days after this contract is signed and shall continue in force until the time permitted under Law for the filing of mechanics' and material men's liens on the Project has passed.~~

C.      ~~Contractor shall require each Subcontractor performing Work valued in excess of 5 percent of the contract Price to furnish to Owner and Contractor proof of issuance by a licensed Surety of both Performance and Payment Bonds for Work to be done by that Subcontractor on the Project. Amount of each Bond shall be equivalent to the value of the Subcontract.~~
Builder's risk & general liability insurance cover Plant Materials performance.

## XLV.  Interpretation of the Contract

A.      Section headings and paragraph numbers have been included in this contract to make reference easier and in no way limit, define, or enlarge the terms, scope, or conditions of this contract.

B.      This contract will be governed, construed and enforced under Texas law, regardless of its conflict of law provisions.  If any part of this Agreement is found by a court or tribunal of competent jurisdiction to be invalid, such portion will be stricken, and the remainder will have full force and effect.  In Bexar County Texas.

## XLVI. Choice of Venue

A.      The Parties agree that venue for any action related to performance of this contract shall be the appropriate court in Bexar County, Texas.

## XLVII. Entire Agreement

A.      The Contract Documents are the entire agreement and constitute a complete integration of all understandings between Contractor and Owner on the subject of the Project. The Contract Documents supersede all prior negotiations, representations and agreements, whether written or oral, and supersede any standard terms and conditions of the parties. No subsequent notation, renewal, addition, deletion, change or amendment to this contract shall have any force or effect unless in the form of a written Change Order or amendment to this contract.

## XLVIII. Severability

Page 21

A.     If any provision of this contract is interpreted or rendered invalid and unenforceable, then the remainder of this contract shall remain in full force and effect.

## XLIX. Inspections

A.     Contractor shall schedule and coordinate all Inspections required by the Contract Documents and by public authority so as not to delay the progress of the Work or the Work of Owner or Separate Contractors. If the Contract Documents require that an Inspection be witnessed or attended by Owner or Owner's Representative, Contractor shall give advance notice of the time and place of the Inspection. Contractor shall schedule Inspections during regular Work Days and normal business hours, unless mutually agreed by Contractor, Owner, and Inspector.

B.     Insofar as applicable and except where superseded by other provisions of the Contract Documents or by government regulation, Inspection of the following Work will be required on the Project [revise as appropriate for this Silo Construction project] (1) Bearing surfaces of excavations before concrete is placed, (2) Reinforcing steel after Installation and before concrete is poured, (3) Structural concrete when poured, (4) Structural framing after erection and prior to being covered or enclosed, (5) Steel welding, (6) Mechanical and plumbing Work following Installation and prior to being covered or enclosed, (7) Electrical Work following Installation and prior to being covered or enclosed, (8) Above-ceiling Work when complete but before the finish ceiling material is installed, and (9) Final Inspections prior to occupancy.

C.     Contractor shall be charged for the cost of rescheduling any Inspection which has been scheduled by Contractor but cannot be completed due to some act or omission of Contractor.

D.     If an Inspection reveals Work of Contractor not in compliance with the Contract Documents or not in compliance with any code or statute, Contractor shall bear the costs of correction, the cost of repeating the Inspection, and any related costs, including reasonable charges by Owner or Owner's Representative for additional services.

## L. Performance Testing

A.     When a performance test is required by either the public authority or the Contract Documents, Contractor shall: (1) Schedule the test, (2) Give adequate notice to Owner of the time and date set for the test, (3) Prepare Samples suitable for testing, and (4) Distribute test results to Owner or Owner's Representative. On request of Owner or Owner's Representative, Samples for testing shall be selected by or in the presence of Owner or Owner's Representative.

B.     Should any performance test disclose that materials or Work of Contractor are not in compliance with Code Requirements or the Contract Documents, Contractor shall bear the cost of replacing the materials or Work and shall pay for additional testing.

## LI. Uncovering the Work for Inspections

A.     So long as tests and Inspections are not complete, Contractor shall not enclose or cover any Work which the Contract Documents or the public authority requires be inspected or tested. Contractor shall give Owner 48-hour notice before covering any portion of the Work which Owner or Owner's Representative has asked to Inspect or test before covering.

## LII. The Construction Schedule

Page 22

A.    Contractor shall prepare and submit to Owner for review and approval an estimated progress Schedule for the Work showing completion within the Contract Time. This progress Schedule shall identify expected starting and completion dates for each part of the job and identify tasks critical to timely completion of the Work.

B.    Contractor may select any type of Schedule which: (1) Is suitable for monitoring progress of the Work (2) Provides easy access to information about the timing of decisions Owner must make and acts Owner must perform, (3) Includes sufficient detail to demonstrate adequate planning for the Work, and (4) Presents a practical plan to complete the Work in an acceptable time period.

C.    Contractor shall plan, develop, supervise, control, and coordinate the performance of the Work so that job progress, sequence and timing conform to the construction Schedule. If Contractor falls materially behind the currently approved construction Schedule, Owner may require Contractor to prepare and submit for approval, at no cost to Owner, a plan for completing the Project within the Contract Time. Failure to submit a plan meeting this Requirement shall constitute grounds for termination under the terms of this agreement.

D.    The Schedule shall allow for and depict the following: (1) Beginning and Completion Dates of each significant task (Work breakdown structure) in the job, (2) Delivery and approval of each Submittal, Samples and Shop Drawing, (3) Inspections and tests, (4) The Work of Subcontractors and Separate Contractors, and (5) Order dates and delivery dates of significant equipment and key materials. The construction Schedule shall include a legend which identifies the meaning of each symbol and abbreviation.

### LIII. Extension of the Time for Completion

A.    Owner shall execute a Change Order for Excusable Delay by extending the Contract Time for the period of the delay. Any of the following shall constitute excusable delay for which the Contract Time shall be extended: (1) Strike, boycott, embargo, terrorism, armed rebellion, quarantine or other obstructive action by employees, labor organizations, discovery of archaeological or paleontological artifacts, act or neglect of a public utility, or, order of government authority, and (2) Fire, flood, earthquake, tornado, tidal wave, lightning, casualty loss, epidemic, rain, wind or unusually adverse weather.

B.    For delay in delivery of materials or equipment or for a shortage of labor that results from unforeseeable circumstances beyond the control and without fault or negligence of either Contractor, or any Subcontractor or Material Supplier of Contractor, Owner will grant an extension of the Contract Time if: (1) Contractor notifies Owner or Owner's Representative promptly on discovery of the anticipated shortage, (2) Contractor substantiates the delay as unavoidable with a detailed chronology of events and all relevant correspondence, and (3) Contractor provides a firm date when the material, equipment or labor will be available.

C.    Any Change Order granted for Excusable Delay shall have no effect on a Claim by Contractor for damage from the same delay for interruption, hindrance, or disruption.

### LIV. Contractor Claims for Delay

A.    The Contract Price shall be adjusted for any increase in the cost of performance of this contract caused by suspension, delay or interruption of the Work due to:, (1) A decision of Owner to change the Scope of the Work, unless the decision is the result of an error or omission by Contractor, (2) A decision of Owner to suspend the Work, unless the decision is the result of an error or omission by Contractor, (3) A failure by Owner or Owner's Representative to comply with the construction Schedule, (4) Any act or neglect of Owner or agent of Owner or any Separate Contractor, (5) Failure of Owner to yield control of the Job Site to Contractor, or (6) Failure of Owner to make payments when due under the terms of this agreement.

Page 23

B.      Within 3 5 Working Days after receipt of a notice of Claim for compensation for suspension, delay, or interruption, Owner shall: (1) Respond with a resolution, remedy, or direction to alleviate the delay, (2) Respond with a notice rejecting the Claim for delay, or (3) Respond with a draft Change Order accepting the Claim for delay. If the issue is not then resolved, Contractor may request a Change Order.

C.      No change in the Contract Time for completion or the Contract Price shall become part of the Contract Documents without a Change Order.

D.      Compensation to Contractor for suspension, delay, or interruption of Work shall include direct overhead (Job Site) expense, a proportionate share of unabsorbed indirect (home office) overhead expense, lost efficiency and lost profit taken as 15 percent of total compensable expenses. Direct overhead costs shall include, without limitation: (1) Labor (with taxes, insurance and fringe benefits) for the idle work force, (2) The fair rental cost of idle equipment (such as vehicles, construction tools and equipment), (3) Facilities (such as temporary structures, water, power, phone, and toilets), (4) The additional cost of Bonds and insurance, (5) Similar direct overhead costs of Subcontractors to whom Contractor is liable for damages that result from the delay, and (6) Demobilization and re-mobilization costs. Unabsorbed indirect overhead costs shall include, without limitation, the proportionate share of office rent, office supplies, office utilities, office equipment, advertising, professional fees, management salaries, technical services, estimating, selling, accounting, bookkeeping and clerical expense, business licenses, taxes (except income taxes), and insurance.  Project Manager will agree to L.V. section, only if we have a bonus or incentive program.  Otherwise, project manager strikes this section—owner has builder's risk and other remedies.

## LV. Liquidated Damages

A.     Time is of the essence with regard to this contract. The Schedule for completion and provisions in this contract for extension of the Contract Time are considered reasonable by Owner and Contractor. Any neglect, refusal or failure of Contractor to reach Substantial Completion within the Contract Time, plus approved extensions of that time, will result in damage to Owner impossible to estimate accurately in advance, and difficult to calculate after the occurrence. In lieu of actual damages for delay, Owner shall deduct from money due Contractor or which may become due Contractor the sum of $_____ [amount to be determined] as liquidated damages for each Calendar Day that Substantial Completion is delayed beyond the Contract Time, plus approved extensions of that time. This daily rate for liquidated damages is reasonable, is our best estimate of actual damages, and is not a penalty.

B.     Time is of the essence with regard to this contract. The Schedule for completion and provisions in this contract for extension of the time for Final Completion are considered reasonable by Owner and Contractor. Any neglect, refusal or failure of Contractor to reach Final Completion within the time provided in this contract, plus approved extensions of that time, will result in damage in the form of inconvenience, loss of opportunities, and higher Inspection, Superintendence, and administrative costs to Owner. These costs are impossible to estimate accurately in advance, and difficult to calculate after the occurrence. In lieu of actual damages for delay, Owner shall deduct from money due Contractor or which may become due Contractor the sum of $_____ as liquidated damages for each Calendar Day that Final Completion is delayed beyond the time provided in this contract, plus approved extensions of that time. This daily rate for liquidated damages is reasonable, is our best estimate of actual damages, and is not a penalty.

C.     Achieving Substantial Completion sooner than the Contract Time, plus approved extensions of that, time, shall earn additional compensation to Contractor of $_____ for each Calendar Day that Substantial Completion is achieved prior to the Contract Time, plus approved extensions of that time.

Page 24

D. ~~Contractor shall not be charged liquidated damages for any failure, neglect or refusal to complete the Work on Schedule to the extent that the proximate cause of the delay was: (1) Strike, boycott, embargo, terrorism, armed rebellion, quarantine, or other obstructive action by employees or labor organizations, discovery of archaeological or paleontological artifacts, act or neglect of a public utility, or by order of government authority, (2) Fire, flood, earthquake, tornado, tidal wave, lightning, casualty loss, epidemic or unusually adverse weather, (3) Any delay of Subcontractors or vendors resulting from items listed in sections 1 or 2 above, or (4) Any act or omission of Owner or anyone acting on behalf of Owner.~~

E. ~~Except as provided elsewhere in this contract, liquidated damages are the exclusive damage remedy for Owner for any failure of Contractor to complete Work according to Schedule. No damages of any other type or description shall be awarded Owner for failure of Contractor to comply with the construction Schedule.~~

## LVI. Suspension of Work by Owner

A.     Owner may, without cause, direct Contractor in writing to suspend all or any part of the Work for a period of up to 30 Calendar Days. Contractor shall halt construction as directed and resume Work at expiration of the suspension period. The Contract Price and Contract Time shall be adjusted by a Change Order for excusable and compensable delay during the period of suspension. Contractor may elect to terminate this contract under conditions provided in this agreement if suspensions of any substantial portion of the Work exceeds, in aggregate, 60 Calendar Days.

## LVII. Right to Stop Work for Non-Payment

A.     If Contractor is not paid any amount not in dispute within 35 Calendar Days after the date due, Contractor shall post on the Job Site and deliver to Owner and all Subcontractors a notice of intention to stop the Work if payments then due are not received in full within 15 Calendar Days. Thereafter, Contractor may suspend the Work until delinquent payments have been received, pursuant to ~~California Civil Code § 3260.2~~

B.     Neither Contractor, nor Surety of Contractor, nor any Subcontractor of Contractor shall be liable for delay or damage that Owner may suffer as a result of suspension of the Work for failure to receive payments due under this agreement so long as: (1) Work was suspended by Contractor in compliance with the terms of this contract and with applicable Law, and (2) There is no good faith dispute that payment is due Contractor at the time of suspension. A good faith dispute exists if Owner provides: (1) A list of specific reasons for nonpayment, including labor, materials, or equipment not in compliance with the Contract Documents, and (2) Contractor is afforded a reasonable opportunity to correct the Defects cited or issue a credit compensating Owner for Defects that cannot be cured promptly.

## LVIII. Substantial Completion

A.     When, in the opinion of Contractor, the Work is Substantially Complete, Contractor shall prepare a preliminary Punch List of Work remaining to be done and deliver that Punch List to Owner's Representative with a request for evaluation of Substantial Completion. If, in the opinion of Owner's Representative, items on the preliminary Punch List are consistent with Substantial Completion, Owner's Representative shall conduct an Inspection of the Work to evaluate compliance with the Contract Documents.

B.     The Project shall not be considered Substantially Complete until: (1) All installed equipment has been tested and found to be in working condition, (these activities are a separate activity from that of commissioning), (2) Contractor has completed performance tests required by the Contract Documents, (3) Reports, maintenance  manuals, warranties, keys, control devices, and Drawings required by the Contract Documents have been  delivered to Owner, (4) Debris, waste, and excess materials have been removed from the site, and (5) Final Inspection has been passed and occupancy has been approved by the public authority.

C.    If, after Inspection, the Project does not qualify as Substantially Complete, Owner or Owner's Representative shall provide Contractor with a written list of the Work found to be: (1) Incomplete, (2) Out of compliance with the Contract Documents, or (3) Defective in operation or workmanship. Contractor shall complete or correct all Work listed prior to requesting a subsequent Inspection for Substantial Completion.

D.    Before Owner takes possession or occupancy or makes use of the Project, Contractor shall receive a comprehensive Punch List of discrepancies to be corrected or Work to be finished by Contractor and a date for completing this Work. Contractor shall complete and correct items on the Punch List by the designated date.

E.    The Punch List given to Contractor is a complete and final list of Defective or incomplete Work on the Project. Owner shall be deemed to have accepted Work not on the Punch List. Nothing in this paragraph shall be interpreted as relieving Contractor of the obligation to meet warranty and call-back obligations.

F.    Contractor shall annotate the Punch List with: (1) A detailed breakdown of the Work required to complete or correct each item, (2) the Subcontractor or trade responsible for the Work, and (3) The dates Work will commence and be finished on each item. No annotation is required for any item on the Punch List which is beyond the control of Contractor. Failure of Contractor to furnish a detailed completion Schedule for items on the Punch List shall constitute grounds for withdrawing acknowledgment of Substantial Completion.

G.    Owner's Representative will prepare a certificate of Substantial Completion for signature by Owner and Contractor when the Project or a specific portion of the Project is ready for occupancy. Except as otherwise provided in the Contract Documents, signing of the certificate of completion shall: (1) Transfer to Owner responsibility for maintenance, safety, utility expense, controlling access at the site, and (2) Begin running of any warranty or call-back period on the Project.

H.    After Substantial Completion, Contractor shall remain responsible for: (1) Damage caused by Contractor while completing the Work, and (2) Safety of crews when completing the Work.

### Signatures

The signatures that follow constitute confirmation by those signing that they have examined and understand the Contract Documents and agree to be bound by the terms of these documents.

Contractor may not begin Work before receiving from Owner a written notice to proceed. Any Work performed by Contractor before receipt of the notice to proceed shall be done at the risk of Contractor and without obligation of Owner.

This agreement is entered into as of the date written below.

Owner: Southton Rail Yard, LLC

By: _____
(Signature)

ORIGINAL

_____
(Printed Name)

_____
(Title)

(Date)

ORIGINAL

**Contractor Name: Plant Materials, LLC**

By: _____
(Signature)

_Alec R. Woodson_____
(Printed Name)

_Project Development_____
(Title)

~~May 12, 2014~~ _MAY 20, 2014_
(Date)

STATE OF _TEXAS_
COUNTY OF _TRAVIS_

The foregoing instrument was acknowledged before
me this _20_ day of _MAy_, 20 _14_, by _Alec Woodson_

_Barbara A James_          _Barbara James_
Notary Public's Signature          Notary Name
My Commission Exp. _10/3/15_



BARBARA ANN JAMES
Notary Public, State of Texas
My Commission Expires
October 03, 2015

**Glossary of Terms**

**Affiliates.** "Affiliates" means any person or entity that directly or indirectly through one or more intermediaries' controls via beneficial ownership of fifty percent or more of voting power or equity in another entity, or is controlled by or under common control with such a person or entity.

**Beneficial Occupancy** refers to Owner's use of the project premises after Substantial Completion but prior to Final Completion. Beneficial Occupancy may occur when the project or some portion is sufficiently complete and systems operational such that the Owner could, after obtaining necessary approvals and certificates, occupy and utilize the space for its intended purpose. The time limit for warranties applicable to that portion of the work begins on the date the Owner begins Beneficial Occupancy, unless otherwise specified in this Agreement.

**Bond** means the security offered by a licensed surety company which may be used to satisfy a claim of failure to perform obligations undertaken in this Agreement.

**Calendar Day** means any day shown on the calendar beginning at midnight and ending at midnight the following day. Contrast the term Work Day which excludes Saturdays, Sundays and state-recognized holidays.

**Certification of Payment** is acknowledgment by someone not a party to this Agreement that Contractor is entitled to payment for work completed.

**Change Order** is a written modification of the Contract Price (including all claims for direct, indirect and consequential damages and costs of delay), Time for Completion and Scope of Work under this

Page 27

Agreement. A Change Order, once signed by all parties, is incorporated into and becomes a part of the Contract Documents.

**Claim** means a demand or assertion by one of the parties to this Agreement seeking, as a matter of right, modification, adjustment or interpretation of contract terms, payment of money, extension of time or other relief.

**Code Requirements** means all laws, statutes, regulations, building codes, ordinances, rules, and lawful orders of all public authorities having jurisdiction over Owner, Contractor, any Subcontractor, the Project, the Job Site, the Work, or the prosecution of the Work.

**Contract Completion Date** means the day by which the Work must be substantially complete. Contract Date is the day on which the contract becomes binding between Contractor and Owner.

**Contract Documents** are this Agreement and all documents incorporated by reference into this Agreement.

**Contract Price** is the amount which will become due in exchange for work performed under this Agreement. Contract Price includes allowances for purchased materials and equipment and may be modified by a Change Order or contract modification. The Contract Price may be paid in one or more installments, including an Initial Payment at or before the start of work, Progress Payments as work is completed, and a Final Payment on final acceptance of the work. Payment Period is the time elapsed between applications for progress payments or prior to the first application for progress payment.

**Contract Schedule** is a graphical representation of a practical plan to complete Work within the Contract Time.

**Contract Time** means the period between Date of Commencement and the date of Substantial Completion.

**Contractor** is an individual, partnership, firm, corporation, joint venture, or other legal entity undertaking the execution of the Work under the terms of this Agreement.

**Defective Work** means construction done under this Agreement that is unsatisfactory, faulty, omitted, incomplete, deficient, or does not conform to the requirements of the Contract Documents, directives of Owner's Representative, or the requirements of an inspection, reference standard, test, or approval specified in the Contract Documents.

**Design Professional** means the person, organization or authorized representative who is responsible to the Owner for design of the Project through preparation of Drawings and Specifications. The term Design Professional may refer to an architect, designer, engineer or landscape architect.

**Drawings** (also called plans or prints) are scale representations of the shape, location, character and dimensions of Work to be completed under this contract. Drawings include plan views, elevation views, transverse and longitudinal sections, large and small scale sections and details, isometrics, diagrams, schedules, tables, data and pictures which depict the completed Project. A group of drawings adequate to complete construction of the Project may be referred to as a plan set. Drawings can be either paper or electronic media.

**Emergency** means an unforeseen event, combination of circumstances, or a resulting state that poses imminent danger to health, life or property.

Page 28

**Excusable Delay** means any circumstance which postpones completion of the Work and for which Contractor is entitled to an adjustment of the Contract Time but not an adjustment to the Contract Price. Contrast Inexcusable Delay which entitles Contractor to neither an adjustment of the Contract Price nor an adjustment in the Contract Time.

**Extra Work** means any change, interpretation, clarification or correction in the Contract Documents or in applicable law, ordinance or regulation which would increase or decrease the quantity of work, delay, suspend or interfere with the work, require an addition to or omission from the work, change the character, quality or nature of any part of the work or material used in the work, change levels, lines, positions or dimensions of any part of the work, require demolition or removal of any work completed under this Agreement, extend or amend the normal work day, alter the construction schedule or require completion of any part of the work at a time other than provided by this Contract when originally made. Final Completion is the date of Owner's acceptance of the Work as fully performed according to the Contract Documents.

**Furnish** means to supply and deliver to the job site.

**General Contractor** is an individual, partnership, firm, corporation, joint venture, or other legal entity undertaking execution of the Work under terms of a Prime Contract.

**Hazardous Materials** means radioactive materials, asbestos, polychlorinated biphenyls, petroleum, crude oil, chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, and toxic substances which are restricted, prohibited, or regulated by any agency of government in the manufacture, use, maintenance, storage, ownership or handling.

**Indemnification** Financial compensation intended to restore someone to their condition before a loss or damage.

**Inspection** is any review of the Project, including a visual review of the Work completed to ascertain compliance with Contract Documents, building codes and construction standards.

**Inspector** is anyone authorized by government or the Design Professional to conduct inspections of contract performance and materials supplied for the Work.

**Install** means to secure in position in compliance with the Contract Documents and includes unloading materials, supplying all necessary equipment and rigs to do the work and performing functional tests which demonstrate fitness for the intended purpose.
Job Site is the address or location of the Project.

**Law** means federal or state statutes, municipal ordinances, building codes, regulations adopted pursuant to statute, executive orders, official interpretations, and other rules and directives issued by government.

**Material Supplier** means any manufacturer, fabricator, distributor, material man or vendor who provides material for the Project but does not provide on-site labor.

**Modification** is a written amendment to the Contract signed by both parties.

**Owner's Representative** means the person or firm authorized to act and make administrative decisions on behalf of the Owner during construction. Any notice required to be delivered to the Owner may be delivered to the Owner's Representative. The scope of authority of the Owner's Representative is defined

Page 29

in this contract. Contractor cannot rely on any decision or instruction by Owner's Representative that is beyond the representative's defined scope of his authority. Nothing in this contract prevents Owner from issuing a notice or instructions directly to the Contractor. The Owner may change the Owner's Representative from time to time and may, in the event that Owner's Representative is absent, disabled or otherwise temporarily unavailable, appoint an interim Owner's Representative.

**Partial Use** means placing a portion of the Work in service for the intended purpose (or a related purpose) before reaching Substantial Completion for all the Work. This partial use does not constitute Substantial Completion.

**Party** (to this contract) means a person or business organization which has an obligation to perform under the terms of this contract.

**Plans** (also called drawings or prints) are scale representations of the shape, location, character and dimensions of Work to be completed under this contract. Plans include plan views, elevation views, transverse and longitudinal sections, large and small scale sections and details, isometrics, diagrams, schedules, tables, data and pictures which depict the completed project. A group of plans adequate to complete construction of the Project may be referred to as a plan set. Plans can be either paper or electronic media.

**Prime** Contract is a written agreement between Contractor and Owner which binds Contractor to furnish labor, equipment, or materials or perform certain work for a price to be paid by Owner.

**Project** means Work to be completed in accord with the Contract Documents. Work at the Job Site may include other projects to be completed by the Owner or other contractors working under other agreements.

**Provide** means furnish and install and includes connecting, testing, and placing in service for the intended use.

**Punch List** is a comprehensive list of incomplete, defective or incorrect Work yet to be completed or which does not comply with Contract Documents. A Punch List may be prepared by the Contractor, Subcontractor, Design Professional or Owner. An initial Punch List will be prepared before application for Substantial Completion. A Close-out Punch List will be prepared before Final Completion.

**Requirements** mean, in addition to obligations, responsibilities and limitations set out in the Contract Documents, the obligations, responsibilities and limitations imposed by law, rules, orders, ordinances, regulations, statutes, codes and executive orders of governmental authorities or fire rating bureaus.

**Retainage** is a portion of each progress payment temporarily held back or retained by the owner. Accumulated retainage is released to Contractor on satisfactory completion of the work.

**Sample** means a physical example of material; equipment or workmanship intended to be representative of some portion of the Work. When approved, samples establish standards for completion of similar work on the Project.

**Schedule of Values** means the detailed breakdown of cost of materials, equipment and labor necessary to complete the Project as described in the Contract Documents.

**Scope of Work** means the Work as defined by the Contract Documents.

Page 30

**Separate Contractor** means a person or firm working under a different contract but on the same site and at the same time as work will be done under this contract.

**Shop Drawings** are diagrams, illustrations, pictures, schedules, performance charts, layouts, schematics, descriptive literature, schedules, performance and test data, and other data which are prepared by the Contractor or a Subcontractor, manufacturer, supplier or distributor, and which illustrate or describe some portion of the Work to be completed in compliance with the Contract Documents. Once submitted to the approval authority and approved, Shop Drawings establish standards for completion of work on Project.

**Similar** means having a like kind, quality and characteristics. Similar is not to be construed as meaning identical or by the same manufacturer.

**Specifications** (also called specs) are the part of the Contract Documents which provide descriptions of materials, equipment, construction systems, technique and workmanship to be used on the Project. Specifications are both instructions to be followed by the Contractor and Subcontractors and a reference for the Building Official to evaluate code compliance.

**Subcontract** is a written agreement between a specialty contractor and General Contractor. Terms of the subcontract require the specialty contractor to complete some portion of the work General Contractor is obligated to perform under another agreement, usually with the Owner.

**Subcontractor** is any person or business entity under contract to a general contractor to perform some portion of the work general contractor is obligated to complete under a contract with the Owner. Subcontractor is an independent contractor performing services for another contractor rather than for the Owner. A person or organization providing supplies or materials for the Project but no job site labor is not a Subcontractor.

**Submittals** demonstrate the way by which the Contractor proposes to conform to the requirements of the Contract Documents. Submittals are shop drawings (diagrams, illustrations, pictures, schedules, performance charts, layouts, schematics, descriptive literature, schedules, performance and test data, and other data) required by the Contract Documents which are prepared for the Contractor to depict some portion of the Work. Submittals are delivered to the Owner for approval or disapproval by the Owner prior to purchase or installation.

**Substantial Completion** means the Project or a designated portion of the Project is nearly in compliance with the Contract Documents and is sufficiently complete to be considered fully operational in all its components and is fit for the intended use. Substantial Completion is reached when a limited number of non-conforming or defective items on a Punch List remain to be completed. Normally, a Project or portion of a Project cannot be considered Substantially Complete until (1) all utilities and services are connected and working, (2) all equipment is installed and in acceptable working condition, (3) additional activity by the Contractor to correct items on the Punch List will not prevent or disrupt use of the facility, and, (4) a certificate of occupancy has been issued by the appropriate authority.

**Sub-subcontractor** is any person or business entity under contract to a subcontractor or any lower tier subcontractor to perform some portion of the work subcontractor is obligated to complete under a contract with the prime contractor. Sub-subcontractors are independent contractors performing services for another contractor rather than for the prime contractor. A person or organization providing supplies or materials for the Project but no job site labor is not a Sub-subcontractor.

Page 31

**Superintendent** is the representative of the Contractor at the job site who is authorized to receive instructions from the Owner or Owner's Representative and who is authorized to direct the performance of work on behalf of the Contractor.

**Surety** means any qualified individual, firm or corporation other than the Contractor, which executes a bond to insure its acceptable performance of the contract.

**Tier** refers to the contractual level of a person or business organization doing work on the Project. A first-tier subcontractor has a contract with the general contractor but not the owner. A second-tier subcontractor has a contract with another subcontractor but not with the general contractor or the owner.

**Work** means all labor, material, equipment, tools, transportation, permanent and temporary utilities, connections, provisions for safety and management services required to complete the Project in compliance with the Contract Documents. Work may constitute the whole or a part of the Project. Work is to be performed in a safe, expeditious, orderly and professional manner in keeping with current standards of the industry. Work includes everything that is or should be evident to a skilled construction Professional after careful examination of the Contract Documents and the Job Site.

**Work Day** means any day, excluding Saturdays, Sundays and state-recognized holidays, shown on the calendar beginning at midnight and ending at midnight the following day.

ORIGINAL

LAST PAGE WITH TEXT

**Schedule A**

LAST PAGE LEFT BLANK

ORIGINAL

CAUSE NO. 2018CI11815

# PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

# EXHIBIT C

 **Plant Materials, LLC**
18866-103 Stone Oak Pkwy
Suite 4
San Antonio, TX 78258

# Invoice

**Invoice #:** SRY014PM02I
**Invoice Date:** 5/27/2014
**Due Date:** 5/27/2014
**P.O. Number:**

| **Bill To:** |
| --- |
| Southton Rail Yard, LLC |
| 12070 Center Road |
| San Antonio, TX 78223 |

| Project Location |
| --- |
| Plant Materials, LLC |
| c/o Southton Rail Yard, LLC |
| 12070 Center Road |
| San Antonio, TX 78223 |

| Description | Proposal Amt | Prior Amt | Due Now |
| --- | --- | --- | --- |
| Southton Rail Yard Silo Construction<br>1st Payment = Signed Contract + 30% (First business day after receipt = the "Project Start")<br>2nd Payment = on 30 days after Project Start Date 20%<br>3rd Payment = on 60 days after the Project Start Date 20%<br>4th Payment = on 90 days after the Project State Date 30% | 2,630,062.80<br>0.00 | | 789,018.84<br>0.00 |

| | | Sub Total | $789,018.84 |
| --- | --- | --- | --- |
| Office: 210-569-9262 | Please Remit All Payments To Frost Bank: | **Payments/Credits** | $0.00 |
| | ACH Routing Number: 114000093<br>Account Number: 020297232 | **Invoice Total** | **$789,018.84** |
| Fax: 866-523-3221 | | Outstanding Balance | $789,018.84 |

CAUSE NO. 2018CI11815

# PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

# EXHIBIT D



CAUSE NO. 2018CI11815

# PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

# EXHIBIT E

Case 1:18-cv-00105-LG-RHW   Document 17-1   Filed 08/27/18   Page 62 of 64



LOCATIONS   NEWSROOM   CAREERS   CONTACT

NT SOLUTIONS  /  LOGISTICS  /  SPECIALTY & AGGREGATE  /  OUR STORY



## OUR STORY



Shale Support believes that the best way to enhance completions is to provide superior service at all stages of the value chain. True to this belief, we rigorously control Delta Pearl's wet mining and dry processing capabilities, our logistical and transportation tracking programs; and our transload storage facilities located throughout the major shale plays. Our attention to details means customers will have Delta Pearl arrive at their well at the right mesh level, right on time. Every time.

Shale Support believes that the best way to enhance completions is to provide superior



LOCATIONS   NEWSROOM   CAREERS   CONTACT

NT SOLUTIONS  /  LOGISTICS  /  SPECIALTY & AGGREGATE  /  OUR STORY

throughout the major shale plays. Our
attention to details means customers will
have Delta Pearl arrive at their well at the
right mesh level, right on time. Every time.







LOCATIONS   NEWSROOM   CAREERS   CONTACT

NT SOLUTIONS   /   LOGISTICS   /   SPECIALTY & AGGREGATE   /   OUR STORY



COPYRIGHT © 2018 SHALE SUPPORT HOLDINGS, LLC. ALL RIGHTS
RESERVED.  |  PRIVACY POLICY